[Civ. No. 15593. First Dist., Div. One. July 13, 1953.]

E. J. CROFOOT, Appellant, v. BLAIR HOLDINGS COR-
PORATION et al., Respondents.

[Civ. No. 15595. First Dist., Div. One. July 13, 1953.]

PAUL RICE, Appellant, v. BLAIR HOLDINGS CORPORA-
TION et al., Respondents.

158

Philip Barnett, Rodney H. Robertson and Roger Anderson for Appellants.

Keesling & Keesling, Henry C. Clausen, Wm. Dwight Whitney and Edward C. Perkins for Respondents.

PETERS, P. J.—Crofoot and Rice separately appeal from an order correcting and confirming an arbitrator's award and from the judgment entered on the award. Section 1293 of the Code of Civil Procedure provides that "An appeal may be taken from an order confirming, modifying, correcting or vacating an award, or from a judgment entered upon an award . . ." This section certainly makes either the order of confirmation "or" the judgment appealable. Whether the section requires an election between the two alternatives need not be decided because the parties have appealed from both, and the same points are presented on both appeals. The appeal of Rice from the judgment was not filed until the 61st

day after its entry (see rule 2(a) of the Rules on Appeal), but the 60th day was a holiday, so that the time to appeal was extended. (Code Civ. Proc., § 12; Rules on Appeal, Rule 45(a); *Grande* v. *Donovan,* 55 Cal.App.2d 694 [131 P.2d 855].)

Before discussing the details of this complicated controversy, a brief statement of facts should be set forth in order that the detailed facts can be related to the overall picture. Crofoot was the sole owner of the stock of T&C, a corporation engaged in the wholesale distribution, upon a nationwide scale, of popcorn vending machines and supplies. Rice managed this corporation on behalf of Crofoot. Crofoot arranged a sale of 27 shares of the capital stock of T&C, which was 54 per cent of the total capital stock, to Blair Holdings Corporation, hereafter referred to as Blair. Written contracts were executed in April of 1947 whereby Crofoot made certain warranties and representations as to the correctness of the T&C balance sheets, current income statements, and certain listings of unfilled orders. These agreements also provided that Rice was to become president of T&C, and should remain as manager, and that Crofoot should become a member of the three-man board of directors. The agreements also gave Blair, within a designated time, the option of purchasing the balance of the shares of T&C. In October, 1947, within the time specified in the option, Blair exercised its rights and purchased the remaining 23 shares, that is, the balance of 46 per cent of the capital stock of T&C. Shortly thereafter Blair exchanged 75,000 shares of its own stock in a complicated deal in satisfaction of the balance of its liabilities to Crofoot. Rice continued as president and manager, and Crofoot as director of T&C.

About a year after the exercise of the option, Blair claimed to have made a delayed discovery that the balance sheets, current income statements and lists of unfilled orders warranted by Crofoot to be true upon the initial sale of 54 per cent of the T&C stock contained false statements, and that Crofoot and Rice, after the initial sale, in their official capacities, had concealed and failed to disclose the falsity of such representations. Blair thereupon sent notices to the San Francisco Stock Exchange, where the Blair shares were traded, and circularized the membership of the exchange, charging that Crofoot's title to the Blair shares was defective, and that Rice, who had received 7,050 Blair shares for services rendered

to Crofoot, also had defective title to his shares. Blair also ordered its transfer agent to refuse to transfer any of the Crofoot and Rice shares, and ordered all dividends on the Crofoot-Rice shares to be withheld. This resulted in Crofoot and Rice being unable to sell their Blair shares. Crofoot had pledged a large portion of his Blair shares as security with the Bay City Bank & Trust Co., and this pledgee was prevented, for a substantial period, from selling these shares to protect its loans.

These controversies resulted in a plethora of actions being filed, with complaints, answers, counterclaims and cross-complaints, and even cross-complaints to cross-complaints. By the beginning of 1949 two court actions were pending in New York and four in California, in which various Blair and Crofoot groups were parties. Basically these actions were aimed by the Blair interests at securing a rescission of the T&C transactions for breach of warranty, or at securing damages for deceit. The Crofoot and Rice group wanted to compel the transfer of the Blair shares, or wanted to secure damages for their conversion, for libel, for disparagement of title, for wrongful institution of civil process, and statutory penalties for failure to transfer the shares.

After most of the actions had come to issue, the parties on March 6, 1950, executed an agreement to arbitrate under Code of Civil Procedure, sections 1280 through 1293. The agreement provided that the parties agreed to arbitrate ''all issues existing between them and raised by any pleadings served by any of them in any of the said actions, other than superseded pleadings, prior to March 10, 1950. . . .

''All parties agree that the arbitration shall be mutually conclusive and binding as to all issues in the Consolidated Action save for such rights as the parties, or any of them, may have under Sections 1287 to 1293, inclusive, . . . of the California Code of Civil Procedure. The parties agree that the decision of the Arbitrator shall be final as to all facts found by him.'' It was also provided that ''The Arbitrator shall be given such powers as are provided for by law,'' and that ''The Arbitrator shall be the judge of the relevancy and materiality of the evidence offered. Strict conformity to all legal rules of evidence shall not be necessary.'' It was agreed that the actions then on file should be stayed pending the arbitration.

The arbitrator selected was Professor George E. Osborne of the Stanford University Law School. He took evidence

and heard argument for many days, received over 4,000 pages of depositions, and permitted some 600 exhibits to be introduced. After lengthy arguments, both written and oral, he rendered his award. The award itself is but five pages in length, but the findings and opinion cover some 215 pages, in which the arbitrator carefully, and in detail, disposed of practically every contention, major or minor, of the parties.

The award, generally speaking, found Crofoot liable in damages, in large amounts, for breach of the warranties contained in the initial agreement to buy and sell the T&C stock, and further found that, after that date, Crofoot and Rice had practiced deceit in their fiduciary relationships by concealing the existence and continuance of certain contingent liabilities of T&C, which resulted in Blair's exercising the option to buy the balance of the stock of T&C. Damages were awarded Blair against Crofoot and Rice, but with various elections, set forth in detail in the award, to avoid the possibility of double recovery upon different causes of action relating to overlapping items of damage. The Blair parties were found liable to Crofoot and Rice for conversion and disparagement of title of the Blair stock. It was also held that the Blair parties had lost their rescission rights because of their laches and delay, because of their affirmation of the transaction after knowledge, and because of their failure to restore or offer to restore benefits received by them. A small statutory penalty was awarded against Blair in favor of Rice. If these awards to Crofoot and Rice be deducted as offsets from the sums awarded to Blair, the overall result of the award is a large judgment in favor of Blair, its precise amount being dependent upon the elections made by Blair, and upon the value of the Blair stock found to have been converted by Blair, and which it must repurchase.

The opinion and award of the arbitrator are the sole guide to the evidentiary facts upon these appeals. The court is not called upon to review the evidence produced before the arbitrator, and such is not included in the record on appeal. The record consists of the opinion and award of the arbitrator, of the pleadings in the various court actions, and the proceedings upon confirmation of the award.

After the award had been made, the Blair parties moved to confirm it, subject to certain modifications. This was opposed by Crofoot and Rice. They unsuccessfully sought a writ of prohibition to prevent confirmation, and argued vigorously before the superior court that the award should not be con-

firmed. The award, subject to correction of a mathematical calculation, was confirmed, and a judgment entered pursuant to its terms. The Crofoot parties attempted, by an application for an original writ, unsuccessfully, to halt the entry of that judgment. Crofoot and Rice thereupon appealed, as already indicated.

Reference should now be made to the pleadings in the six actions which were the subject of the arbitration.

Rice was not a party to the two New York actions. The first New York action, filed upon December 20, 1948, was by the Blair Holdings Corporation against Crofoot. This complaint stated two causes of action. The first sought to rescind both purchases of the T&C stock for false representations, and breach of warranty as to the income statements, balance sheets and unfilled orders of T&C. As to the breach of warranty, there was no allegation of knowledge of the falsity of the representations. The second sought damages for deceit. It realleged all the pertinent allegations of the first cause of action, added allegations as to knowledge of the falsity and intent to deceive, of concealment of the breach of warranty, and that Rice and Crofoot, in their fiduciary capacities, rendered false and untrue reports to Blair, resulting in the purchase of the remaining 23 shares of the stock of T&C by Blair. The prayer was for rescission of the T&C purchase transactions, including the transfer to Crofoot of the 75,000 shares of Blair stock ''and/or'' for $750,000 damages. Crofoot's answer denied the principal allegations, and pleaded laches, ratification and estoppel against the Blair parties, and inability on their part to transfer back the benefits they had received in the transaction. Blair filed a bill of particulars in this action specifying the transactions relied upon, and alleging that the damages specified were occasioned by the false representations made by Crofoot and Rice.

The second New York action was by Crofoot against Mario Giannini, and also named various Blair companies as defendants. It charged a conversion of Crofoot's Blair stock, and a conspiracy between the Blair parties and Giannini to gain control of this stock. A second cause was for conversion, libel and disparagement of title, and wrongful institution of civil process. Legal and equitable relief were prayed for.

A California action was instituted by the Bay City Bank & Trust Co. against the Blair parties. The plaintiff was the pledgee of 20,000 shares of Blair stock that had been

transferred to it as pledgee by Crofoot. This complaint sought an order compelling Blair to transfer title to the stock to it, and also requested that the statutory penalty provided by Corporations Code, section 3016, be imposed. By way of cross-complaint, Crofoot and Rice having been brought in as parties, Blair pleaded a cause of action for rescission, and asked that a constructive trust be imposed on the Blair shares. This cause of action for rescission contains similar allegations to those in the New York action, except that here it is specially alleged that the representations and warranties made by Crofoot and Rice were known by them to be false and untrue, and that Rice conspired with Crofoot in making the representations and warranties, and in concealing their falsity from Blair. A demurrer to this count of the cross-complaint on the ground that it contained more than one cause of action was overruled by the California court.

This cross-complaint also alleged a cause of action for fraud against Crofoot and Rice for concealment and misrepresentation of T&C's financial position while Rice and Crofoot held official positions, and is very similar to the allegations in the second New York action. The prayer is for restoration of the Blair shares, their impounding *pendente lite,* rescission of the agreements to buy the T&C stock, and for $750,000 damages.

Crofoot counterclaimed and cross-complained, alleging the following causes of action:

1. Failure to transfer shares held by Bay City as pledgee after a court order had been secured and a bond posted, which resulted in a major loss to Crofoot. This apparently is intended to allege a cause of action for conversion of these shares;

2. Refusal to pay dividends to Crofoot or Bay City upon the Blair stock held by them;

3. Conversion of the balance of the Blair stock still held by Crofoot, and failure to pay Crofoot a later dividend on that stock;

4. Denial to Crofoot of the right to vote the Blair stock;

5. Disparagement of Crofoot's title to the shares and libel of him by the letters sent to the San Francisco Stock Exchange and its members. The prayer asks for $440,107.54 compensatory and $880,215.08 punitive damages, for an injunction and for an order compelling the transfer of such shares.

Rice cross-complained for conversion of his 7,050 shares of Blair stock by that company's refusal to transfer the shares

or pay dividends, for a statutory penalty of $500 for refusal to transfer the shares. The prayer of Rice's cross-complaint requests judgment "for the full value of said Paul Rice's stock at $3.10 per share in the amount of $21,855, or for the difference between said price and the market price." He also prayed for punitive damages of $50,000, for past dividends, for an injunction and for the statutory penalty.

Crofoot also brought a California action (*Crofoot* v. *Dardi, et al.*) against certain officers, employees and agents of Blair, alleging a conspiracy to prevent the transfer of Crofoot's personally held Blair shares, apparently a conversion, failure of Blair to pay declared dividends on such stock, denial to Crofoot of the right to vote such stock, libel and disparagement of title, a willful conspiracy to prevent the Bay City Bank from selling the 20,000 shares pledged to it by Crofoot resulting in a loss to him, aggravated by failure to pay dividends on such stock. Here the prayer was for $440,107.54 damages, treble punitive damages, and for an injunction.

Rice also brought a California action against Blair alleging the conversion of his 7,050 shares. Here the prayer demanded judgment "for the full value of plaintiff's stock at $2.90 per share, or in the alternative, judgment for the difference between said price and the price eventually to be received by plaintiff when he is able and does sell and transfer said stock, or the difference between said price and the market value of said stock when plaintiff is able to sell and transfer." Rice also requested an order compelling Blair to make the transfer, and for an injunction.

Blair brought in Crofoot as a party to this action, and then cross-complained against him and Rice in language almost identical with that used by Blair in the Bay City Bank action, the first California action herein discussed.

The sixth action was by Rice against Blair for a writ of mandate to compel the transfer to Rice of his 7,050 shares. When the arbitration agreement was signed an alternative writ had been issued in this proceeding and an answer filed.

These were the six actions that the parties sought to arbitrate. Neither party secured from any of the courts where such actions were pending, orders submitting the actions to arbitration pursuant to the arbitration agreement. The six actions were referred to in the arbitration agreement and listed in a schedule attached. The agreement expressly provided that the parties "agree to submit to arbitration, under Sections 1280 through 1293 . . . of the California Code of

Civil Procedure, all issues existing between them and raised by any pleadings served by any of them in any of the said actions, other than superseded pleadings, prior to March 10, 1950.'' Unanswered pleadings were to be deemed denied. The agreement then provided, in addition to the clauses already noted, the following provisions: ''Pending completion of the Arbitration contemplated by this Agreement and confirmation of the award to be made therein, subject to the provisions of Sections 1287-1293, inclusive, of Title X, Part 3 of the California Code of Civil Procedure, each of the actions listed in Schedule I shall be stayed in all respects, save for completion of depositions, and appeals shall be similarly stayed, and an order to this effect shall be consented to and filed by the respective parties or their attorneys in each of said actions, it being the intent of this Agreement to preserve the status quo of each of said actions as of the date upon which this Agreement becomes effective and binding upon the several parties.''

As already pointed out, no one, prior to the arbitration, sought the consent of the courts where such actions were pending by requesting an order submitting the cases to arbitration. The record shows, however, that after the arbitration hearings had taken place, but before the award had been made, Crofoot noticed a motion for such an order, *nunc pro tunc,* it being his contention that such an order of submission was necessary if the award to be rendered was to become effectual. Blair opposed the motion as unnecessary. The motion was denied ''without prejudice.'' This failure to secure a submission order, on these appeals, is alleged by Crofoot to invalidate the award.

The award is a most complete and exhaustive document. As already pointed out, the findings and opinion cover some 215 pages. A summary of the award follows:

The arbitrator first considered the liability of Crofoot. He examined, generally, the breach of warranty and deceit causes of action against him. He noted that while the cause of action for breach of warranty did not have its own allegation of damage, merely pleading a rescission, that the prayer for damages applied to both causes, and intimated that the prayer alone might be sufficient to allow damages for breach of warranty. He went on to hold, however, that the second or deceit cause of action included the allegations of the breach of warranty cause of action; that despite this apparent improper joinder of two causes of action in one count, the

whole set of allegations, under modern concepts of a cause of action, did constitute a "broad cause" for "false and untrue representations, concealments and warranties made independently or in conspiracy."

After finding a valid statement of a cause of action for deceit, it was found that it and the complaint as a whole contained valid causes of action for breach of warranty as to the first T&C purchase contracts, and valid allegations of fraud and deceit based upon the representations and warranties in those contracts. It was also found that Blair had properly pleaded, independently, a cause of action for fraud and deceit for misrepresentations made between the first and second purchases of the T&C stock which resulted in Blair's executing the option and making the second purchase. The arbitrator noted that in reference to the transaction of November 19, 1947, whereby the Blair shares were exchanged in satisfaction for the balance of the liability on the purchase of the T&C stock, which occurred about a month after the exercise of the option, Blair had not alleged such transaction was entered into on reliance on such representations, nor had it been alleged that Crofoot or Rice had knowledge of the falsity or the intent to induce Blair to enter this transaction. Accordingly it was found that Blair had no independent right to rescind this transaction, and that if Blair once possessed such right it had been lost by delay.

The arbitrator then analyzed at length the April, 1947, transactions leading up to the first purchase by Blair of 54 per cent of the T&C stock. Prior to this sale Crofoot owned T&C, but Rice, who was secretary and general manager of that corporation, had a contract entitling him to 10 per cent of the net profits or of the sale proceeds. At that time T&C sold its popcorn vending machines via order bills of lading with sight drafts attached, sent to a Galveston bank for credit to T&C's account and for collection through correspondents. T&C retained title until the drafts were paid.

Early in 1947 Crofoot talked to several directors of Blair, in San Francisco, about Blair's buying T&C. In March and April of 1947 Crofoot personally negotiated the sale in New York, taking the Blair parties in great detail over the financial operations of T&C and furnishing them with financial statements later the subject of the warranties. The arbitrator found that the Blair parties relied upon Crofoot and his reputation, making little independent investigation of its own. Crofoot argued before the arbitrator that Blair should

not have so relied, being a "sophisticated buyer," and that the misrepresentations were so obviously false that no one should have relied upon them. These contentions were rejected by the arbitrator, he holding that the evidence showed that the Blair negotiators were inexperienced, and, at any rate, sophisticated or not, did in fact rely upon Crofoot, and that Crofoot contended he did not know of the falsity of the representations and therefore could not logically contend that Blair should have known of their falsity.

The arbitrator then found false and untrue representations and warranties in the April contracts as to both the balance sheet and income statements of T&C in that in reference to two major transactions the balance sheet falsely showed the making of contracts and the receipt of payments on these sales by T&C, while the income statements falsely showed an absolute bank credit in favor of T&C resulting from such sales. These two transactions involved the sale by T&C of 491 machines to Barry Distributors at a sales price of $71,599.44, and 100 to Popcorn of Louisiana at a sales price of $13,300. Both of these distributors had dishonored the drafts presented to them and had not paid for the machines. These facts were not disclosed in T&C's books. The books showed these two major sales, and an unconditional liability of the bank in Texas to T&C. Blair, of course, knew that purchasers of the machines were given credit and that sight drafts in the ordinary course of business would be outstanding, but what Blair did not know, and what the books failed to disclose or misrepresented, was that these drafts were in default for periods far beyond the ordinary course of business. In fact, the books failed to disclose that by March 17, 1947, a notice of cancellation of Popcorn's distributorship had been served, and that all shipments to Barry had been stopped, that company then being in a hopeless condition. Rice, in fact, notified T&C on April 10, 1947, that he intended to set up a new distributorship for Barry.

The arbitrator then found that, because these same liabilities were concealed by both the balance sheet and the income statement, Blair was only entitled to one recovery for both violations. It was found that the representations were material in that they made the cash position of T&C illusory in that they set forth fictional sales amounting to one-third of the current income, and represented that the second largest distributor of T&C was satisfactorily operating. It was further found that these representations and warranties were

made with the intent to induce action by Blair in reliance upon them, and that Rice had actual knowledge of their falsity.

The arbitrator spent some time discussing the question as to whether Crofoot had knowledge or notice of the falsity of the representations, but finally, based upon Crofoot's intimate knowledge of T&C's business, his knowledge of some of the distributorship difficulties, his presence at conferences aimed at finding new distributors for those in default, found that, although the evidence did not show that Crofoot had positive knowledge of the defaulted drafts, there was no reasonable grounds for him to believe that such defaults did not exist.

The arbitrator concluded that Blair was entitled to damages against Crofoot for breach of the warranties contained in the April contracts, but was not entitled to a rescission of those contracts. Fixing the damage thus caused presented some difficulties. There had been no loss as to the 100 machines sold to Popcorn because there was a bona fide outright resale of them. The Barry machines were also resold to a new distributor known as Automatic Merchants, but this was not an outright resale. T&C entered into a deal whereby a corporation known as CMAC financed Automatic Merchants and T&C guaranteed to CMAC the amount of all the notes of Automatic Merchants. This guaranty created a contract liability which when allocated to the machines resold, reduced by payments, increased by interest, and considering certain offsets, resulted in a net loss to T&C of $22,554.88.

In considering the deceit cause of action as to the April contracts, the arbitrator noted that in addition to the facts discussed under the warranty cause of action it was necessary to find an intent to deceive upon the part of Crofoot, or the affirming of knowledge of that not positively known. Crofoot was found liable for deceit in making representations of facts not known to him to be true. The liability for such deceit was found to be $77,931, but it was pointed out that because of the damages for the breach of the warranties already discussed and those incurred as to breach of warranty as to unfilled orders, the damages for breach of warranty exceeded those for deceit. It was held that since both liabilities were predicated upon the same representations they were mutually exclusive, and that Blair must elect between them, and presumably would elect the larger sum.

The arbitrator then considered some special damages caused by the contingent liability to CMAC as guarantor of the notes of Automatic Merchants. On April 26th and 30th, 1947, T&C had made written contracts with Automatic Merchants as a new distributor. Automatic agreed to buy 491 machines held by Barry under the defaulted drafts already discussed and 275 other machines that had been paid for by Barry. These written contracts were expressly conditioned upon Automatic giving satisfactory financing ''with CMAC or other lending institution.'' But before these agreements were signed Rice had orally agreed with CMAC that T&C would sign the repurchase agreement, or guaranty, and similar representations were made to Automatic, it being given the option to use CMAC for financing or finding local financing if it desired. The arbitrator found that the oral agreement with Automatic was collateral and supplementary to the written agreement and that it imposed a specific duty on T&C to either guarantee to CMAC Automatic's notes, or accept independent financing by Automatic if it elected to secure such financing.

Automatic was unable to secure local financing so that on May 13, 1947, T&C signed an agreement with Automatic and CMAC guaranteeing Automatic's credit up to $150,000. Under this agreement the 491 machines held under the Barry defaulted drafts, plus the 275 machines owned by Barry but repurchased by Rice with money personally advanced by Crofoot, were reinvoiced to Automatic upon sight drafts accepted and paid by CMAC, which drafts were then substituted with Barry's Texas bank in satisfaction of the defaulted drafts.

The arbitrator found that this contingent liability of T&C to CMAC was incurred not in the ordinary course of business pursuant to an agreement before the sale to Blair on April 30, 1947, of the 54 per cent of T&C stock, and was itself a breach of warranty.

Blair first had notice of the existence of some sort of repurchase agreement in January, 1948, and knowledge of the guaranty arrangement July 23, 1948, but did not gain actual knowledge of the link between the guaranty and the payment of the defaulted drafts until October of 1948.

While the arbitrator had found that Crofoot had no actual knowledge of the defaulted Barry drafts, he here found from all the facts, including Crofoot's evasive testimony and his personal loan to Rice to repurchase the 275 Barry machines,

that he had actual knowledge of the making of the guaranty to CMAC.

The liability of Crofoot for this misrepresentation was found to be identical with liabilities already found except as to the new contingent liability on the 275 machines repurchased from Barry for sale to Automatic. Properly adjusted and apportioned this additional liability was fixed at $12,654.28.

The April contracts for the sale of T&C stock contained an express warranty that a statement as to unfilled orders was true and correct. The arbitrator found that the subject matter of this warranty was information furnished by Crofoot consisting of a file of distributors' contracts, showing the number of machines ordered, their price, the amount of commissions, and a listing of the number of machines shipped. Taken together these documents purported to show the number of unfilled orders. It was found that the warranty was intended to mean that there were valid subsisting contracts represented by the orders, but was not intended to guarantee future performance of the contracts. The arbitrator then held that liability for breach of this warranty would be limited to the three contracts of distributors whose financial condition had become hopeless, and who had their contracts cancelled at the time the warranty was made. The arbitrator excluded liability for distributors who were then in partial default or were showing financial weakness.

The three distributors involved were Barry, Popcorn of Louisiana, and Consolidated Popcorn Supply. All were in a hopeless condition when the warranty was made. Crofoot was found to have had no belief in the truth of his representations as to these three distributors, and it was found that Blair had no knowledge of the falsity of the representations.

The damages for this breach of warranty were calculated by taking the total number of machines unshipped under the contracts and multiplying by the net profit per machine that should have been made. So computed, and allowing all legitimate offsets, the total damages for breach of the warranty as to unfilled orders as to these three companies, was fixed at $137,132.26.

The arbitrator then found that Crofoot had a tort liability for deceit in connection with these same unfilled orders, but that such liability was the same as that involved on the breach of warranty and deceit in connection with the balance sheets and income statements. Blair is entitled to only one recovery

and must elect among its claims. If it elects one claim of damages it is barred as to the others.

The arbitrator then devoted his attention to misrepresentations, concealments or nondisclosures between May 1, 1947, and October 31, 1947, the period between the two purchases of the T&C stock by Blair. During this period, pursuant to the provisions of the April contracts, Rice became president and general manager of T&C, and Crofoot became a member of the three-man board of directors. This arrangement was to assure continuity in the management of the business. The arbitrator found that in performing their functions Rice and Crofoot owed a fiduciary duty of disclosure to Blair.

It was found that Crofoot during this period improperly concealed from Blair the past misrepresentations made by him, and that this was a material inducement to Blair to exercise the option in October. As to new misrepresentations and concealments it was held that certain representations made by Rice were mere "puffing" and that certain representations as to certain distributors were not false and were outside Crofoot's actual knowledge. Crofoot, however, was found liable for a breach of fiduciary duty in failing to disclose the facts as to the CMAC guaranty, which liability was fixed at $35,158.86. But this liability was also found to be in duplication of the damages already allowed for breach of this guaranty, and so these damages were allowed only upon election to forego other claims.

The arbitrator then separately considered whether there had been any additional misrepresentations and concealments between October 31, 1947, to November 19, 1947. This last date is when the contract was executed whereby Blair turned over 75,000 of its shares in satisfaction of its liability to Crofoot. The arbitrator found that no separate cause of action had been pleaded for this period, that there were no new misrepresentations, and therefore no liability for this period.

The arbitrator then held that all rescission rights of Blair were barred, partly by laches and delay, partly because of some knowledge of the facts, and also because of failure on the part of Blair to offer to restore, and its inability to restore, what it had received under the contracts. Pending these suits T&C had become a practically worthless corporation, partly due to the misrepresentations already discussed, but also due to the acts of Blair. Since Blair is not appealing, these findings need not be further considered.

The arbitrator next turned his attention to Blair's claims against Rice, pointing out that these claims paralleled those against Crofoot, particularly where it was claimed that a conspiracy between the two existed.

As to the April, 1947, contracts it was found that Rice was not a contracting party, had then no duty of disclosure, and that any partial disclosures that amounted to misrepresentations were not relied upon by Blair. Rice was not liable for any misrepresentations made in connection with this contract.

As to Blair's rights against Rice between May 1, 1947, and October 31, 1947, however, it was found that, as president and general manager of T&C, Rice was Blair's agent, acted as Crofoot's subagent with the same duties owed to Blair as were owed by Crofoot, and in some functions acted as a direct agent for Blair. It was found that Rice not only failed to reveal the CMAC guaranty, but actively concealed it in several ways set forth in the findings. It was also found that a conspiracy existed between Crofoot and Rice proved by their former associations, Rice's 10 per cent profit sharing contract with Crofoot, Crofoot's advance to Rice in connection with the repurchase of the 275 Barry machines, and certain coincidences of trips and meetings between the two. Thus it was found that Rice was not only independently liable for breach of a fiduciary duty in failing to disclose the CMAC guaranty (and also in failing to disclose some facts as to what is referred to as the ''Chicago situation,'') but also liable, with Crofoot for conspiracy. The arbitrator carefully limited Rice's liability to the loss incurred by Blair upon exercising the option in October of 1947, and by a method of computation, fully set forth in the findings, fixed this liability at $23,446.72. But the arbitrator was most careful not to permit Blair to recover from both Crofoot and Rice for this same damage. Crofoot's liability for deceit was fixed at $77,000 plus, but an alternative right of recovery for breach of warranty in a greater sum was also granted against him. It was provided that Blair could have but one recovery. If it elected to enforce its rights against Crofoot for breach of warranty recovery against Rice is denied, and if it elects to hold Crofoot for deceit any damages received from Crofoot will constitute a satisfaction *pro tanto* against Rice, and vice versa.

Consideration was next given to Crofoot's claims against Blair. After first holding that the various causes of action

had been properly pleaded, the arbitrator disposed of each cause as follows:

It was held that Crofoot could not recover on his cause of action against Blair for the claimed wrongful initiation of civil proceedings, because the evidence showed that the actions had been instituted in good faith, that Blair had probable cause for the institution of such proceedings, and there was an absence of a termination of such proceedings favorable to Crofoot.

On the conversion count, however, the arbitrator found the Blair Holdings Corporation guilty of such conversion, by reason of the corporate refusal to permit a transfer of stock by one with title and a right to transfer. Good faith and innocent mistake constitute no defense to such an action. Damages for the conversion were calculated at $3.50 per share (pursuant to a stipulation that such sales in that amount had been made in New York), fixed by the highest sale price of Blair stock after the conversion and up to the start of the arbitration proceeding. The arbitrator found that Blair blocked the sale by Crofoot of 31,725 shares, and also the sale of the 20,000 shares pledged with the Bay City Bank, thus converting 51,725 shares, which at $3.50 per share comes to $181,037.50, less the $36,515 received ultimately on the sale of the Bay City Bank stock, leaving a balance of $144,522.50. But as a condition to receiving this amount Crofoot must transfer to Blair the certificates for 33,725, the balance of the converted stock held by him. The theory of this conditional award is that a conversion amounts to a forced purchase by the converter. Crofoot was also awarded $12,631.25 in withheld dividends on which interest was allowed, but interest was denied on the main award. Crofoot was also allowed, by stipulation, $1,270.71 as the cost of a bond necessary to free the pledged shares, but denied other costs, and also denied the statutory penalty provided by section 3016 of the Corporations Code. These awards were against Blair Holdings Corporation only.

As to the cause of action for disparagement of title, which is a cause of action for the publication, without privilege, of matter disparaging to another's property rights resulting in damage, the arbitrator held that while most of the Blair parties had an honest belief in the validity of the claims asserted by them, and acted only upon advice of counsel after a full and fair disclosure to counsel, that this was not true of Dardi, vice-chairman of the Blair board of directors, chair-

man of its executive committee, and acting chief of the company. As to him, it was found that he did not make full disclosure to counsel of many pertinent facts, set forth in the findings, that he acted contrary to counsel's advice in various specified ways, and by his actions had demonstrated that he did not act within the privilege that would constitute a defense. His acts imposed liability not only on himself but on Blair. Damages, limited to the amount for which the stock might have been sold, were awarded Crofoot, but since this could not possibly exceed the amount already awarded for conversion, it was decreed that he must elect between the two rights.

As to the libel cause of action, it was found that but one false publication was proved, which was later corrected, and which resulted in no damage.

In considering Rice's claims against Blair the arbitrator held that Rice had properly pleaded against Blair two causes of action for the conversion of his 7,050 shares, and also a cause of action for the statutory penalty. In pleading his damage and in his prayer in the conversion actions Rice had averred that the highest value of this stock was $3.10 per share. He attempted to file amendments to conform to proof so as to add new causes of action to his pleadings, and to amend the prayer so as to ask for damages based on $3.50 per share, the amount the Blair interests stipulated in the Crofoot actions was the highest amount large blocks of the Blair stock had been sold. Permission to file such amendments was denied. The arbitrator ruled that he, under the arbitration agreement, lacked the power to grant amendments to conform to proof. He also held that the allegation in the prayer fixing damages at $3.10 a share was not amendable, was material, and limited the maximum damages allowable. Thus, after finding that the facts already set forth in the Crofoot action also supported a cause of action by Rice for conversion, the arbitrator fixed such damages at $3.10 per share at $21,855, allowed $1,762.50, with interest, as damages for withheld dividends, such awards being conditioned upon his transfer of the shares to Blair. He also allowed $300 statutory penalty against the stock transfer agent of Blair, based upon her refusal to transfer the shares.

The award proper is quite short. It provides that for breach of the three warranties in the April, 1947, agreement as to the income statements, as to unfilled orders, and as to the absence of liabilities Blair is awarded against Crofoot

specified amounts totalling $172,341.42. The award provides that "Should Blair elect to enforce its rights under this part of the Award [it being the most favorable award to Blair], it shall be precluded from enforcing against Crofoot or Rice any other rights to damages given to it by other parts of the Award."

Blair was then awarded against Crofoot $77,931 for deceit in connection with the April, 1947, agreement. "Should Blair elect to enforce its right under this part of the Award, it shall be precluded from enforcing against Crofoot any other rights given to it by other parts of the Award. Furthermore, if Blair elects to enforce its right under this part of the Award, any amount it collects in satisfaction of it shall reduce, *pro tanto*, the amount of its right under the Award against Rice."

Blair was next awarded $35,158.56 as damages against Crofoot for breach of his fiduciary duty to disclose to Blair the existence of the CMAC guaranty. The elections as to this award were somewhat complicated. It is provided that if Blair elects to enforce this part of the award it is precluded from enforcing its rights to damages for breach of warranty as to the income statements, fixed at $22,554.88, and for breach of warranty as to no liabilities, fixed at $12,654.28. It was further provided that election to take these damages for breach of fiduciary duty would reduce, *pro tanto*, the deceit damages.

Crofoot is allowed to offset his recovery against Blair if he transfers 33,725 shares to Blair. In the unlikely event that Blair elects a recovery that is less than the amount awarded to Crofoot, Crofoot can recover, upon transfer of the shares, the excess amount.

Blair is awarded against Crofoot $23,446.72, with interest, from November 15, 1948, to the date of the award for his failure to disclose the contingent liability assumed by T&C. Election by Blair of rights for breach of warranty against Crofoot precluded these damages, Rice not being liable for breach of warranty, but simply concealed the true facts as to what Crofoot had warranted. It was also provided that election by Blair to collect damages for deceit against Crofoot would reduce, *pro tanto*, the amount awarded against Rice, in the amount so recovered. But if Blair elected to collect this award against Rice any amount collected would reduce, *pro tanto*, the amount of the award against Crofoot.

Crofoot was awarded $144,522.50 against Blair for conversion of 51,725 shares of Blair stock, plus $12,931.25 for withheld dividends, with interest, the condition of enforcement being the transfer to Blair of 33,725 shares. There was also awarded to Crofoot $1,270.71 as reimbursement for a bond required to transfer the stock pledge to the Bay City Bank.

Crofoot was awarded a right, in an unspecified amount against Dardi and Blair Holdings Corporation for disparagement of title, but these damages are the same and subject to the same conditions as Crofoot's conversion rights above discussed. Enforcement of the conversion and other rights above discussed will preclude enforcement of his rights for disparagement of title, and vice versa.

Rice was awarded $21,855 for conversion of his 7,050 shares of stock, and $1,762.50, with interest, as damages for withholding dividends, conditioned upon his transfer to Blair of the 7,050 shares. Against the stock transfer agent Rice was also awarded $300 as a statutory penalty for refusing to transfer.

Each party was required to bear his own costs, including his share of the arbitration costs as provided in the agreement. All other claims asserted by any party were denied.

On the motion of Blair to correct, modify and confirm the award, a mathematical error was corrected, and the award confirmed as corrected. Judgment was entered the same date (July 5, 1951) determining that the arbitration finally determined the rights of the parties.

At the inception of this appeal we are met with the contention made by Crofoot that the superior court was without jurisdiction to confirm the award or to enter judgment thereon for the reason that no court order was ever secured submitting the then pending court actions to arbitration. In the absence of such an order, it is contended, there was merely a voluntary submission of the parties to a common law arbitration. A common law arbitration award is not specifically enforceable and can only be enforced by an independent court action. It is urged that, lacking an order of submission, the superior court was without power to confirm, or to enter judgment.

Crofoot's arguments are all based on the law as it existed prior to 1927. Prior to that date it was undoubtedly the law that both common law and statutory arbitrations existed in this state, that in the absence of an order of submission the arbitration was deemed to be a common law arbitration, and

that in such common law arbitration the award could only be enforced by an independent action and could not be entered as a judgment. (*Fairchild* v. *Doten,* 42 Cal. 125; Kagel, *California Arbitration Statute,* 38 Cal.L.Rev. 799, 806.) It was then necessary to hold that both common law and statutory arbitrations existed in this state because the then statutory arbitration was limited to certain controversies, and because the then statute—section 1283 of the Code of Civil Procedure —provided that the arbitration agreement could provide for the submission order by a court, and a statutory arbitration could not be had unless such submission order was secured from a court and filed with the clerk. (*Draghicevich* v. *Vulicevich,* 76 Cal. 378 [18 P. 406] ; *Ryan* v. *Dougherty,* 30 Cal. 218; *Heslep* v. *San Francisco,* 4 Cal. 1.)

Since 1927, however, these limitations on statutory arbitrations no longer exist. In that year, upon the recommendation of the Judicial Council (First Report of the Judicial Council, 20, 27), the Legislature completely redrafted the arbitration law, by redrafting sections 1280-1293 of the Code of Civil Procedure. ■ Under the law as it presently exists there is no field for a common law arbitration to operate where the agreement to arbitrate is in writing. Under the provisions of section 1281 the parties may, in writing, submit "any controversy" to arbitration. The provision formerly existing requiring the order of submission to be filed with the clerk of the court was entirely deleted. There is now no requirement for the securing of a submission order or that any such order be filed with the clerk or at all. ■ Now section 1281 reads: "Two or more persons may submit in writing to arbitration any controversy existing between them at the time of the agreement to submit, which arises out of a contract . . . or the violation of any other obligation. They may also so agree that a judgment of a court of record, specified in writing, shall be rendered upon the award, made pursuant to the submission. If the court is thus specified they may also specify the county in which the judgment shall be entered. If the writing does not specify, the judgment may be entered in the superior court of the county . . . in which said arbitration was had." Thus, not only is there no express requirement of first securing a court order of submission, but the last two sentences of section 1281 necessarily imply that if the particular court is unspecified, or no court is specified, the court in the county where the arbitration was had will obtain jurisdiction in the absence of any prior submission by it. This conclusion

is fortified by section 1291 which provides that judgment may be entered in the court where the application for confirmation was filed.

The effectiveness, operation and enforcement of a common law arbitration differ in almost every respect from a statutory arbitration. ■ We conclude that by the adoption of the 1927 statute, the Legislature intended to adopt a comprehensive all-inclusive statutory scheme applicable to all written agreements to arbitrate, and that in such cases the doctrines applicable to a common law arbitration were abolished. As Kagel puts it (38 Cal.L.Rev. at p. 809) : "It is reasonable that parties who voluntarily agree in writing to arbitrate should be bound by the statute and should not as an afterthought be permitted to escape from their contract through the portals of the common law." ■ It must be held that the arbitration here involved is a statutory arbitration,* and that since the statute not only does not require a prior order of submisson but directly implies that none is required, such order is not essential to confer jurisdiction upon the court to entertain a proceeding to confirm the award or to enter judgment thereon.

■ Crofoot also contends that the arbitration statute does not include liabilities in tort, and that for this reason this is not a statutory arbitration. The statute is made applicable to all agreements in writing to submit to arbitration "any controversy . . . which arises out of a contract or the refusal to perform the whole or any part thereof or the violation of any other obligation." (Code Civ. Proc., § 1281.) Thus the statute, extending as it does to the violation "of any other obligation," clearly includes tort liabilities. [8] Moreover, even if the statute were limited to disputes "arising out of a contract," which it is not, the present controversy certainly involves a dispute that "arises out of a contract." There is no requirement that the cause of action arising out of a contractual dispute must be itself contractual. At most, the requirement is that the dispute must arise out of contract. That is certainly true here. There is no merit to the point.

■ Crofoot next argues that under the terms of the arbitration agreement the arbitrator was limited to finding the facts, and therefore the agreement necessarily contemplated presenting such findings to the various courts where the actions were pending for their legal conclusions based on such

---

*The arbitration agreement refers to the statute as governing in at least three places.

findings. That not having been done, the judgment is void. This conclusion, so at variance with normal procedure in arbitration proceedings, is based entirely on the one sentence appearing at the end of clause two of the arbitration agreement to the effect that it is agreed "that the decision of the Arbitrator shall be final as to all facts found by him." The contention completely overlooks or disregards the preceding sentence to the effect that "All parties agree that the arbitration shall be mutually conclusive and binding as to all issues in the Consolidated Action save for such rights as the parties, or any of them, may have under Sections 1287 to 1293, inclusive, of Title X, Part 3 of the California Code of Civil Procedure." Obviously, the sentence quoted by Crofoot was not intended to require the findings to be submitted to the courts where the actions were then pending. That sentence has relevancy, if at all, only on the question of the scope of the review permitted, a point later discussed.

Crofoot also contends that the court lacked jurisdiction because the arbitration agreement failed to provide for the entry of judgment upon the confirmation. The agreement provides that the parties "agree to submit to arbitration" the issues involved in the six enumerated actions "under Sections 1280 through 1293, . . . of the California Code of Civil Procedure." The last sentence of section 1281 provides that, when the agreement does not specify the court, the judgment may be entered in the superior court of the county in which said arbitration was had. In *Snyder* v. *Superior Court*, 24 Cal.App.2d 263 [74 P.2d 782], it was held that submission of disputes to an arbitrator for "determination" implies that the parties are to be bound by his determination, and that the statute fills the gap in the agreement by furnishing the procedure to be followed in obtaining such judgments. Here the agreement necessarily implied, if it did not provide expressly, that the provisions of sections 1280-1293 should be read into and become part of the agreement.

Crofoot next contends that in various respects the arbitrator exceeded his powers as conferred upon him by the arbitration agreement. Before directly discussing these contentions something should be said about the scope of the arbitrator's powers, the extent to which the superior court could or should have reviewed these powers, and the scope of our powers on this review.

Arbitration has had a long and troubled history. The early common law courts did not favor arbitration, and

greatly limited the powers of arbitrators. But in recent times a great change in attitude and policy has taken place. Arbitrations are now usually covered by statutory law, as they are in California. Such statutes evidence a strong public policy in favor of arbitrations, which policy has frequently been approved and enforced by the courts.

 The strength of arbitration is that it is not compulsory but is predicated upon the voluntary agreement of the parties to arbitrate future or existing disputes. Since this is so, it is well settled, and all the parties to this appeal agree, that the arbitrator derives his powers from the arbitration agreement. He has no legal right to decide issues not submitted to him and must decide all issues that are so submitted. But in a statutory arbitration the terms of the statute are written in by implication to the arbitration agreement, and where not inconsistent with the agreement, the terms of the statute control.

The statute here involved, expressly made a part of the arbitration agreement, contains several provisions relating to the powers of the arbitrator and of the trial court upon a motion to confirm. Section 1288 of the Code of Civil Procedure provides that upon application of any party to the arbitration, the superior court of the county "must" vacate the award if the arbitration was secured by corruption or fraud, where any arbitrator was corrupt, where the arbitrator is guilty of misconduct in refusing a postponement upon sufficient cause, in refusing to hear pertinent evidence or other prejudicial misconduct. No serious contention is made that any of these provisions are applicable. Then subdivision "d" of the section provides, in part, that the award must be vacated "Where the arbitrators exceeded their powers, or so imperfectly executed them, that a mutual, final and definite award, upon the subject matter submitted, was not made. . . ."

Section 1289 of the Code of Civil Procedure requires the appropriate superior court upon application of any party to the award to modify or correct the award where the award contains an evident miscalculation, evident mistake in description, where the arbitrator decides issues not presented to him or "Where the award is imperfect in a matter of form. . . ."

It is conceded by all here involved that, under the statute and the terms of the arbitration agreement, the superior court upon motion to confirm, and this court on appeal, has no power to review the sufficiency of the evidence to sustain the award,

and in fact the evidence produced before the arbitrator is not even made a part of the record on appeal. ▋ Under the 1927 statute, it is well settled that both before the superior and appellate courts every intendment of validity must be given the award and that the burden is upon the one claiming error to support his contention. (*Popcorn Equipment Co.* v. *Page*, 92 Cal.App.2d 448 [207 P.2d 647].) ▋ It has been held that the arbitrator need not make findings or give reasons for his conclusions. (*Sapp* v. *Barenfeld*, 34 Cal.2d 515 [212 P.2d 233].) ▋ Certainly it is settled that the courts have no power to review the sufficiency of the evidence. (*Pacific Vegetable Oil Corp.* v. *C.S.T., Ltd.*, 29 Cal.2d 228 [174 P.2d 441]; 5 Cal.Jur.2d p. 120, § 52.) The law is not quite so clear as to a court's powers of review over questions of law. The earlier cases held that the court had the power to review errors of law, at least where they appeared upon the face of the award.* (*In re Frick*, 130 Cal.App. 290 [19 P.2d 836]; *Utah Const. Co.* v. *Western Pac. Ry. Co.*, 174 Cal. 156 [162 P. 631].) The later cases have gone much farther in granting finality to the award even as to questions of law. In *Pacific Vegetable Oil Corp.* v. *C.S.T., Ltd.*, 29 Cal.2d 228, 233 [174 P.2d 441], it was bluntly held that "The merits of the controversy between the parties are not subject to judicial review." In *Sapp* v. *Barenfeld*, 34 Cal.2d 515, 523 [212 P.2d 233], the court held: "Even though a party expressly asserts a lawful claim in the submission or raises it by the presentation of evidence to the arbitrators, the law does not guarantee that the claim will be allowed. Arbitrators, unless specifically required to act in conformity with rules of law, may base their decision upon broad principles of justice and equity, and in doing so may expressly or impliedly reject a claim that a party might successfully have asserted in a judicial action." (See, also, *Riley* v. *Pig'n Whistle Candy Co.*, 109 Cal.App.2d 650 [241 P.2d 294]; *McKay* v. *Coca-Cola Bottling Co.*, 110 Cal. App.2d 672 [243 P.2d 35]; *Glesby* v. *Balfour, Guthrie & Co., Ltd.*, 63 Cal.App.2d 414 [147 P.2d 60]; *Jardine-Matheson Co., Ltd.* v. *Pacific O. Co.*, 100 Cal.App. 572 [280 P. 697]; Kagel, *California Arbitration Statute*, 38 Cal.L.Rev. 799, 825, et seq.; Fraenkel, *The New York Arbitration Law*, 32 Columb. L.Rev. 623, 638.) In *United States* v. *Moorman*, 338 U.S. 457 [70 S.Ct. 288, 94 L.Ed. 256], the United States Supreme Court,

---

*But even prior to 1927 it was held that only "gross" errors of an arbitrator were reviewable—*In re Connor*, 128 Cal. 279, 282 [60 P. 862].

in upholding as final the arbitrator's determination, held that, whether the problem raised was one of law or of fact, the courts should not fritter away the arbitrator's powers under the guise of interpretation.

Under these cases it must be held that in the absence of some limiting clause in the arbitration agreement, the merits of the award, either on questions of fact or of law, may not be reviewed except as provided in the statute.

But Crofoot contends the agreement does limit the powers of the arbitrator beyond the provisions of the statute. In this connection he relies principally upon the last sentence of clause 2 of the contract: "The parties agree that the decision of the Arbitrator shall be final as to all facts found by him." That clause, says Crofoot, limits finality to fact questions, and necessarily excludes finality as to law questions. This interpretation is a strained and unnatural one and violates the obvious spirit of the contract. This interpretation completely disregards the first sentence of the same clause which reads: "All parties agree that the arbitration shall be mutually conclusive and binding as to all issues in the Consolidated Action save for such rights as the parties, or any of them, may have under Sections 1287 to 1293, inclusive . . . of the California Code of Civil Procedure." Then follows the provision as to finality as to facts.

Reasonably interpreted these two sentences conferred finality on the arbitrator's award as to all issues, fact or of law, except as limited by statute. The fact clause was obviously inserted merely to assure that, regardless of the statute, finality was to be given to the findings of fact.

This interpretation not only follows from a reasonable interpretation of the two sentences, but is suggested, if not compelled, by other provisions of the agreement. The parties agree to submit to the arbitrator "all issues" in the six pending cases, and do so pursuant and subject to the provisions of the California arbitration law. The arbitrator is given "such powers as are provided for by law," the arbitrator is made "the judge of the relevancy and materiality of the evidence offered," strict compliance with legal rules of evidence is waived, the arbitrator is empowered to determine procedure, and to require briefs on the facts or law. The whole spirit of the agreement is that these parties, when the agreement was executed, wanted to settle the many court actions then pending between them, carefully selected a competent and impartial arbitrator, and were then content, as long as

the arbitrator acted within the limitations of the arbitration statute, to accept his determinations as final, both as to law and facts. Now that such determinations have not turned out as this appellant hoped, he is attempting to secure a complete reconsideration of many legal (and some factual) determinations in this court. Under his agreement and the provisions of the law, except where permitted to do so by statute, this he cannot do.

We turn now to a discussion of Crofoot's contentions that the arbitrator exceeded his powers in various respects. He first contends that the arbitrator exceeded his powers by creating and deciding three causes of action not involved in the six actions submitted to him. ██ If the arbitrator in fact created causes of action not within the arbitration agreement, and then decided these unsubmitted issues, that would require a vacation of the award as being in excess of the arbitrator's powers within the meaning of section 1288 of the Code of Civil Procedure. (*Bierlein* v. *Johnson*, 73 Cal. App.2d 728 [166 P.2d 644].)

Crofoot urges first that the arbitrator awarded damages against him for breach of warranty, which is a fact, and contends that Blair had only pleaded a cause of action for rescission based upon breach of warranty, and asked damages only for deceit. Hence it is urged damages were awarded upon an issue not pleaded and hence not submitted to the arbitrator.

██ It is true that in the main New York action Blair, in his first cause of action, pleaded a breach of warranty and asked to rescind his two contracts of purchase of the T&C stock. The second cause is mainly devoted to alleging damage caused by the fraud and deceit of Crofoot. The prayer asked for rescission, ''and/or'' for damages, and for other, further and different relief. This prayer, including the prayer for damages, was directed at both causes of action. Moreover, all the allegations of the first cause of action were expressly incorporated into the second. Thus, even if the prayer plus the pleading of all the facts, did not raise the issue of damages in the first cause of action, the issue of damages for breach of warranty was directly involved in the second cause of action by the incorporation in such second cause of all of the allegations of the first. Thus the second count contained both a cause of action for damages for breach of warranty, and damages for fraud and deceit. Thus, even

technically considered, the issue involving damages for breach of warranty was submitted to the arbitrator.

It is true that this second count improperly joined two causes of action in one count, and it is also true that in the New York action Crofoot demurred on this ground, and such demurrer was overruled. All of the existing pleadings, including this New York complaint which included the second count containing at least two causes of action, one of which was for damages for breach of warranty, were submitted to the arbitrator. He notes in his opinion that before him this improper joinder, a mere defect of form and not of substance, "was not objected to . . . even as a matter of form." Thus, in awarding damages for breach of warranty, the arbitrator did not exceed his powers.

Crofoot next claims the creation of a new cause of action by the arbitrator for breach of a fiduciary duty owed by Crofoot to Blair. Such contention requires but scant consideration. In the second New York cause of action Blair pleaded all the facts upon which it relied to show the fraud and deceit of Crofoot. Included were facts showing the relationship between Blair, Crofoot, and Rice, created by the contracts. Nondisclosure in violation of a fiduciary duty is simply a specialized form of fraud. The complaint contained ample allegations to warrant the arbitrator in deciding this issue.

The last and third contention of Crofoot in relation to the charge that the arbitrator improperly created new causes of action relates to the awarding of $4,130 damages for nondisclosure of the true amount of unfilled orders to Consolidated Popcorn Supply. The contention that this amounted to an award of damages for a cause of action not pleaded is not based upon the contention that Blair did not plead a general cause of action for breach of the warranty as to unfilled orders generally, but is predicated upon the fact that Blair, in response to a demand, in the New York action, filed a bill of particulars in which it did not list this item of damage. But that bill of particulars expressly averred that "Plaintiff is not presently able to state in what, if any, additional respects the unfilled orders of T&C Company were less than as shown on the Statement of Unfilled Orders," thus reserving to Blair the right to give further particulars upon discovery. Moreover, there was no bill of particulars as to the California actions where a good cause for breach of this

warranty was properly pleaded. Under these circumstances the issue was included among those submitted to the arbitrator.

Most of the balance of Crofoot's contentions to the effect that the arbitrator exceeded his powers involve questions of law or fact that are conclusive on the parties and not subject to review under the rules already stated. Thus the award gave Crofoot an election between his conversion rights and rights for disparagement of title, and imposed the condition of a forced sale of the Blair stock upon the exercise of either election. While such a condition undoubtedly was proper in the conversion action, it is doubtful whether it should have been imposed in the disparagement of title action. Normally, disparagement of title does not require the injured party to sell the property disparaged to the other party. Normally, the injured party recovers the decrease in value caused by the disparagement. (Restatement of Torts, § 633, comment ''d.'') It is on these grounds that Crofoot urges an excess of power on the part of the arbitrator. Even if the arbitrator decided this point incorrectly, he did decide it. The issue was admitted properly before him. Right or wrong the parties have contracted that such a decision should be conclusive. At most, it is an error of law, not reviewable by the courts.

 This same reasoning applies to the contention that the arbitrator, in excess of his powers, erroneously enforced an oral contract to guarantee the debt of another, unenforceable under the statute of frauds. This refers to the oral contract with CMAC that T&C would sign a repurchase agreement involving a guaranty of the credit of Automatic Merchants. This transaction has been fully set forth in the statement of facts. On its face it would appear that such an oral agreement is unenforceable under the statute of frauds. But what Crofoot fails to mention is the express finding of the arbitrator that T&C also had the oral agreement, prior to the date of the written agreement, with Automatic Merchants to guarantee its debts through CMAC. A promise to the debtor to guarantee his debts is not a promise to guarantee the debt of ''another'' within the meaning of the statute of frauds. (*King* v. *Smith*, 33 Cal.2d 71 [199 P.2d 308].) At any rate, this too was a question of law, within the power of the arbitrator to decide and therefore his determination is conclusive.

 Crofoot next claims that he was denied the right of recoupment of $11,171.34 commission expense earned by T&C

upon the Barry transaction. This is not even a question of law. The arbitrator found that this specific amount was swallowed up when T&C incurred the contingent liability upon the CMAC guaranty. Thus this was a question of fact within the issues submitted. Questions of fact and the sufficiency of the evidence cannot be reviewed by the courts.

■ Crofoot next contends that the arbitrator exceeded his powers in allowing Blair damages computed on the basis that Blair owned 100 per cent of the T&C stock, the true fact being that, when the warranties were breached, Blair had purchased but 54 per cent of the stock. It will be remembered that Blair purchased 54 per cent of the stock in April, and 46 per cent in October of 1947. This, obviously, is an attack on a factual question. The April contract contained the option agreement that was exercised in October, so that the arbitrator was justified in finding that breach of the warranties led to the exercise of the option. Moreover, there is an express finding that Blair did not learn of the defaulted drafts until 1948 so that, since the same warranties were included in the October contract as were contained in the April one, the breach of this warranty is obvious. While the arbitrator did find that Blair had knowledge of the unfilled orders in September of 1947, so that he had knowledge of the breach of this warranty in October, when the option was exercised, the arbitrator has impliedly decided that there existed compelling reasons why the option was exercised. ■ Although these reasons are not spelled out in the findings, since it is the law that the arbitrator is under no compulsion to explain his award or give reasons for his conclusions (*Sapp* v. *Barenfeld,* 34 Cal.2d 515 [212 P.2d 233]), we must conclusively assume those conclusions are supported.

■ The last contention made by Crofoot in this series of objections is that the arbitrator used the wrong date in calculating the value of the deduction of damages allowed in respect to the 275 machines in Barry's inventory. If this were an error, a point we do not decide, it was an error of mixed law and fact, or of law, and, as such, not reviewable on this appeal.

■ The next major contention of Crofoot is that the award is not "mutual, final and definite" within the meaning of section 1288(d) of the Code of Civil Procedure. It is urged that the various elections contained in the award, particularly those relating to the conversion liability, rendered the award uncertain and deprived it of the requisite finality

and conclusiveness. It is somewhat difficult to follow this contention. The award is definite. The amounts of damages are fixed and the rights of offset are likewise definite. All issues submitted were decided. The elections provided for are clear and definite and part of an earnest effort on the part of the arbitrator to achieve substantial justice among the parties.

Crofoot does cite one case that holds that conditioning the receipt of a credit upon a land conveyance rendered the award of the arbitrator tentative and defective, because the contingency was forever left open. (*Carnochan* v. *Christie,* 24 U.S. (11 Wheat.) 446 [6 L.Ed. 516].) But there is a line of authority upholding awards containing elections or contingencies that might never occur, or might become impossible of performance. (*Clement* v. *Comstock,* 2 Mich. 359; *Williams* v. *Williams* (Miss.), 11 Smedes & Marshall 393; *Thornton* v. *Carson,* 11 U.S. (7 Cranch) 596 [3 L.Ed. 451].) In *Peebler* v. *Olds,* 56 Cal.App.2d 8 [132 P.2d 233], the appellate court upheld as not uncertain and inconclusive an award allowing a payment contingent in amount to be made upon a future date.

We see no logical reason why the elections here contained in the award should be held, as a matter of law, to render it uncertain and inconclusive. The elections are clear and definite. They are embodied in immediately or conditionally enforceable judgments which are clear and certain and as to which there can be little doubt but that those entitled will elect the most productive liability. The award, and the supporting opinion, show a studied and careful effort to do justice between these parties. With the many conflicting and overlapping causes of action involved the only practical approach for the protection of all was to set forth the award in a series of elections. The award, in our opinion, complies with the requirements of section 1288.

Crofoot next complains that the arbitrator failed to pass upon the pleaded issue of the capacity of Blair Holdings Corporation to sue. When Blair turned the 75,000 of its shares over to Crofoot in partial payment for its purchase of the T&C stock, this was done through the mechanism of Blair organizing a corporation known as Auto-Vend, a wholly owned subsidiary of Blair, and Auto-Vend was the entity that actually contracted with Crofoot for the purchase of T&C. Crofoot alleged these facts and then alleged Blair's incapacity to sue. Blair alleged that Auto-Vend was its agent. The

arbitrator made no specific finding on the incapacity issue, although setting forth the facts of the Auto-Vend transaction. Obviously, the arbitrator did pass on this issue because he awarded damages to Blair. He was not required to set forth his reasons for doing so. ▌ It must be presumed "That all matters within . . . a submission to arbitration were laid before the arbitrators and passed upon by them." (Code Civ. Proc., § 1963(18).)

▌ It is next asserted that in various respects the findings do not support the award. Most of these contentions are purely factual. Thus it is claimed the evidence as to Crofoot's intent to deceive was speculative, and unsubstantial, and that there was no evidence to show that contracts forming the basis of the warranty as to unfilled orders did not exist. It is also asserted that speculative damages were awarded without proof of actual loss from breach of the warranties, that the arbitrator should have found that Blair was a "sophisticated buyer," etc. These problems all deal with the sufficiency of the evidence to sustain the award, and, as such, do not involve problems reviewable on this appeal.

It is next claimed that the arbitrator erroneously found that Blair was not chargeable with the knowledge of Price Waterhouse gained by it of the fact that Barry had defaulted on the outstanding drafts. Price Waterhouse had been hired by Blair to make an audit of T&C's books and gained such knowledge during the course of the audit. This knowledge was not conveyed to Blair. The arbitrator found that Price Waterhouse was an independent contractor, and that, under the facts, Blair was not chargeable with knowledge gained by the auditor and uncommunicated to Blair. Appellant relies on the Restatement of Agency, section 272, and certain cases, to establish the principle that where a person is hired solely to secure certain information, or is authorized to conduct transactions based upon information so secured, the principal is bound by such person's knowledge so given although uncommunicated to him, whether such person is an agent or independent contractor. ▌ Even an agent's knowledge is not necessarily attributable to the principal unless it relates to the transaction for which the agency exists. ▌ Price Waterhouse was not hired as Blair's agent to purchase T&C from Crofoot, but simply to make an audit of T&C for Blair. Price Waterhouse was not employed to participate in any transaction involving Crofoot. This being so, it was a question of fact as to whether Price Waterhouse was under a duty to divulge the informa-

tion it had gained to Blair, and whether Blair was chargeable with such knowledge in Blair's transactions with Crofoot. The arbitrator's determination is not reviewable.

Crofoot next urges that there were patent miscalculations throughout the award that require a modification of the award under section 1289 of the Code of Civil Procedure. Here this appellant makes identical contentions to many of those made upon the argument that the award should be vacated. We have held that these assertions do not require that the award be vacated. For the same reasons they do not require that the award be modified.

The last major contention of Crofoot is that the order of confirmation and the judgment entered thereon are void. It is first claimed that the superior court in San Francisco exceeded its jurisdiction in attempting to enter judgment in the New York actions. The obvious answer to this contention is that the parties contracted to submit the controversy set forth in the New York actions to a California arbitration under California law. Those controversies existed and were submitted to the arbitrator in California, the New York captions being used to identify the controversy. Moreover, all the issues involved in the New York actions were also pleaded in the California actions. It is, of course, the law that in the absence of agreement to the contrary the law of the forum governs arbitration proceedings (see annos. 85 A.L.R. 1124; 93 A.L.R. 1073).

Crofoot also points out that the arbitrator, in his opinion, held that if Blair elected to assert his lesser right to damages, Crofoot was entitled to recover from Blair the amount his award might exceed the award elected by Blair. The judgment does not mention this purely theoretical right of Crofoot, and it is therefore asserted that the judgment does not conform to the award. Blair has now recovered a judgment for the larger sum which it will naturally enforce, so that any right of Crofoot to recover any possible excess has no practical meaning.

Crofoot next complains that interest runs against him in the awards made in favor of Blair immediately, while he has to await a future date before interest on his award starts to run. This distinction was sound. Blair's awards were based on breach of warranty and fraud and deceit. Crofoot's claim was based primarily on a conversion. Before Blair can be liable at all Crofoot must convey the Blair stock to Blair—

if Crofoot does not, no liability for the conversion will exist. Obviously, interest on the Crofoot awards should not start to run until that forced sale takes place.

There is no merit in any of the contentions of Crofoot, and as to him the order and judgment must be affirmed.

We turn now to a consideration of the contentions made by Rice. He, too, has appealed from the order confirming the award and from the judgment entered after the order of confirmation was made.

Most of the points raised by Rice are similar to those raised by Crofoot, and for the same reasons lack merit. All of his contentions involve attacks on the sufficiency of the evidence or involve questions of law which cannot be reviewed on this appeal.

His first point is that the evidence is insufficient to support the causes of action found to exist against him. He asserts that there was no evidence of any nondisclosure by him constituting a violation of his fiduciary duty. This contention is, of course, simply an attack upon the weight of the evidence, and completely overlooks the findings in reference to his continuing failure to disclose the facts in reference to the defaulted drafts. He also contends that Crofoot's knowledge as a T&C director of the defaulted drafts conveyed to him by Rice constituted, so far as Rice is concerned, notice to Blair. Thus, so it is claimed, Rice must be exonerated from the consequences of his nondisclosure to Blair. Obviously, knowledge of an adverse agent acting for himself and against the interests of his principal, as was Crofoot, will not constitute knowledge to the principal (Restatement of Agency, § 282), particularly when the two conspire to defraud the principal.

 It is also asserted that the evidence is insufficient to support the finding of a conspiracy between Rice and Crofoot to not disclose the true facts to Blair. But Rice was also found independently liable. At any rate, this contention, involving as it does the weight of the evidence, is not reviewable.

 The next major contention of Rice is that the award exceeded the scope of the issues by finding that Rice had breached a fiduciary duty owed to Blair, it being contended that such issue was not pleaded. The allegations in this respect in reference to Rice are similar to those already discussed relating to Crofoot. For reasons discussed in dispos-

ing of the identical contention in reference to Crofoot, it must be held that this point is without merit.

Rice next complains that the award is imperfect and uncertain in that the rights to damages of the parties are so unclear as to be incapable of enforcement. His main thought seems to be that he cannot know his liabilities until Blair elects among his several rights. Rice is in no different legal position than any other joint tort feasor against whom the holder of the right may enforce it against the one he elects.

■■■ The last point raised by Rice relates to the amount of damages awarded him against Blair for conversion. Although the arbitrator, pursuant to a stipulation, had fixed the highest value of the Blair stock in the Crofoot conversion case at $3.50 per share, he fixed the value of the same stock in the Rice case at $3.10 per share. He did this because Rice had pleaded the highest value of this stock at $3.10 per share. He refused to permit amendments to conform to proof to raise new causes of action and to raise the allegations of Rice's pleading in reference to the amount of damage. His reason for refusing to permit an amendment to conform to proof in regard to damages was that under the arbitration agreement he lacked power to allow such amendment.

This was a proper interpretation of the extent of the arbitrator's powers. The arbitration agreement lists the six pending actions. Then it provides: "The parties to this Agreement agree to submit to arbitration . . . all issues existing between them and raised by any pleadings served by any of them . . . prior to March 10, 1950."

Thus the parties agreed to limit the arbitrator's powers to those issues set forth in the pleadings as they then existed. So far as Rice is concerned, those pleadings set forth a cause of action for conversion of stock and asked for damages based on $3.10 per share. The proof showed a possible higher value of $3.50. But the pleadings submitted to the arbitrator limited his powers to fixing such value at $3.10. In the absence of a stipulation agreeing to expand those issues the arbitrator, under the terms of the agreement, had no power to do so.

■■■ Of course, in the absence of an amendment, normally, even a court has no power to award damages in excess of the amount claimed in the complaint. (*Frost* v. *Mighetto*, 22 Cal. App.2d 612 [71 P.2d 932]; *Meisner* v. *McIntosh*, 205 Cal. 11 [269 P. 612]; *Merced Irr. Dist.* v. *San Joaquin L. & P. Corp.*, 220 Cal. 196 [29 P.2d 843]; *Commercial etc. Bank* v. *Bank of*

*W. Hollywood,* 125 Cal.App. 402 [13 P.2d 976].* A court would, however, in a proper case, have the power to grant an amendment to conform to proof. But here the parties by their agreement to arbitrate deprived the arbitrator of that power.

In concluding this opinion we desire to comment on the work performed by this arbitrator. His opinion, findings, and award, disclose that he has performed a careful, lawyer-like and judicial job in an earnest effort to adjudicate fairly the complicated rights and responsibilities of these parties. He is to be congratulated on a job well done.

On the appeals of both Crofoot and Rice, the judgment and order appealed from are affirmed.

Bray, J., and Wood (Fred B.), J., concurred.

Appellant Crofoot's petition for a hearing by the Supreme Court was denied September 10, 1953.

---

*It has been held that since conversion damages are fixed by statute, damages may be awarded by a court without amendment in accordance with the statutory provision and in excess of the prayer. (*Kimball* v. *Swenson,* 51 Cal.App. 361 [196 P. 781]; *Du Pont* v. *Allen,* 110 Cal.App. 541 [294 P. 409].) But in *Meisner* v. *McIntosh,* 205 Cal. 11 [269 P. 612], it was held that the rule of these cases had to be limited to a situation where the case was tried on an agreed theory as to damages.