[S. F. No. 17321. In Bank. Nov. 12, 1946.]

PACIFIC VEGETABLE OIL CORPORATION, Appellant,
v. C. S. T., LTD., Respondent.

Manson, Allan & Miller and Dudley F. Miller for Appellant.

Lillick, Geary, Olson & Charles, Joseph J. Geary and Edwin L. Gerhardt for Respondent.

SHENK, J.—Pacific Vegetable Oil Corporation moved in the superior court pursuant to sections 1288 and 1290 of the Code of Civil Procedure to vacate an arbitration award made against it and in favor of C. S. T., Ltd. The motion was denied and the moving party appealed from the order.

The controversy arose over the failure of C. S. T., Ltd. to deliver a cargo of copra to Pacific Vegetable Oil Corporation. The latter, herein referred to as buyer, entered into contracts with the former, referred to as seller, for the purchase of two shipments of copra to be loaded in the Fiji Islands and delivered at San Diego for transshipment to Mexico. The first contract was executed on October 30, 1941, for copra to

be loaded in the Fiji Islands on the S. S. Edna during November-December, 1941. That shipment was delivered to the buyer at San Francisco in the latter part of the following February. The second contract, dated November 8, 1941, called for a shipment of copra on the S. S. Edna (on her return from the previous voyage) during January-February, 1942. The quantity to be delivered was 2,200 long tons, at $79.50 U. S. currency per ton of 2,000 lbs. c.i.f. San Diego, payment to be made against a letter of credit established by the buyer in San Francisco.

The contracting parties were expressly subject to prevailing government regulations and to published rules of the Foreign Commerce Association of the San Francisco Chamber of Commerce. Rule 513 of the General Rules requires that any dispute arising under contract be submitted immediately to arbitration before a committee of the Foreign Commerce Association of the San Francisco Chamber of Commerce. Rule 557, relating specifically to copra, reads:

"Seller shall not be responsible to Buyer for delayed or non-shipment directly or indirectly resulting from a contingency beyond his control, such as embargo, act of government, strike, fire, flood, drought, hurricane, war, insurrection, riot, explosion, epidemic, pestilence, earthquake, accident, perils of the sea, tidal wave, or any other contingency beyond Seller's control not herein enumerated. If, due to any of the causes provided herein, shipment by steamer is not made within two months or by sailing vessel within three months after the contractual time for shipment, contract shall terminate with respect to any goods not then shipped."

Rule 515 provides that in the event the seller claims that delayed or nonshipment is due to a contingency beyond his control he must submit proof thereof.

Because of this country's entry into the second world war in December, 1941, and the delay in discharging the cargo under the first contract, the buyer in January, 1942, began making inquiries of the seller regarding the possibility of delivery under the second contract. The buyer received notice that the seller was not permitted to obtain an export permit for shipments of copra except to the British Ministry of Food at Canada, and for that reason the contract was cancelled. Considering the advices insufficient proof of inability to perform and upon the seller's refusal to arbitrate, the buyer on May 1, 1942, filed in the superior court a petition

for an order directing the arbitration to proceed. The S. S. Edna arrived at the Fiji Islands on her return voyage in June, 1942. The order directing arbitration to proceed was issued on December 31, 1942.

The rules of the Foreign Commerce Association of the San Francisco Chamber of Commerce relating to arbitration and appeal are as follows:

Arbitration is held before a committee appointed by the Chairman of the Foreign Commerce Association of the San Francisco Chamber of Commerce at the San Francisco office of the association (rule 500). The committee consists of three arbitrators, and the parties are bound by the decision of any two (rule 502).

Rule 505 reads: "Written statements of fact, together with written arguments thereon, must be presented in quadruplicate to the Foreign Commerce Association of the San Francisco Chamber of Commerce, which shall be submitted in their entirety to the arbitrators, but no oral evidence shall be given or personal appearance of the parties permitted unless requested by the arbitrators."

Rule 506: "Immediately upon receipt thereof, the Chairman of the Association shall submit a copy of the statement of fact to the respective parties to the arbitration, and each shall have the right to reply thereto. . . ."

There is no provision for a hearing in the presence of the parties or for the opportunity to examine witnesses. The signed request for arbitration (form prescribed by rule 504), binds the applicant to abide by the award and in the event of an adverse decision to make prompt settlement. It authorizes the arbitrators to be appointed and to "proceed without further notice."

Rule 508, prior to March, 1943, provided: "The findings and award of the arbitrators shall be in writing, signed by the arbitrators, *fully setting forth the facts of the case* and a copy thereof shall immediately be furnished the parties to the dispute." In March, 1943, the rule was amended by omitting the words in italics.

Rule 511 provides for an appeal to a board of appeal of the association, no member of which shall have been an arbitrator in the matter involved on the appeal.

Three arbitrators were appointed pursuant to the rules. The buyer and the seller each filed an opening statement. Each received a copy of the other's opening statement. Each

filed a reply. The reply statements were not exchanged, there being no rule requiring it nor provision for presentation of further statements or arguments. The buyer did not see the seller's reply statement until after the arbitrators' award. The arbitrators' unanimous decision was made on July 29, 1943, and was based on the opening statements and replies thereto from which, however, all names and other matters of identification were removed before submission. The award stated: "Evidence submitted confirmed Seller's contention of termination of contract because of force majeure. The arbitrators, therefore, have no option but to find in favor of C. S. T. Ltd., and cancellation is hereby sustained."

The buyer noticed an appeal from the arbitration award to the Board of Appeal of the Foreign Commerce Association of the San Francisco Chamber of Commerce, and submitted a statement on appeal setting forth the grounds upon which it contended that the award was a nullity. Two grounds were set forth: (1) That there had been no compliance with rule 508 which it contended required the arbitrators to set forth fully the facts of the case; and (2) that the buyer had not had an opportunity in the arbitration proceeding to see or answer the reply statement of the seller which the buyer claimed constituted in fact the seller's case in chief rather than a reply to the buyer's opening statement.

After receiving a copy of the award the buyer wrote to the San Francisco Chamber of Commerce, Foreign Commerce Association, requesting that the award be corrected to conform to rule 508 as in effect at the date of the contract. In reply the buyer was advised that the rule had been amended in March, 1943, by deleting the provision calling for a full statement of the facts in the award, and that the arbitrators were guided by the rule as amended.

It is not contended that the rule as amended was not duly adopted and published as an association rule. ■ There is no general rule that arbitrators must find facts and give reasons for their awards. In fact, the rule and general practice is to the contrary. (See *In re Connor,* 128 Cal. 279 [60 P. 862]; *Dugan* v. *Phillips,* 77 Cal.App. 268 [246 P. 566].) Apparently the rule was amended to conform with the general practice. ■ There is no doctrine which, after the date of a contract or during the pendency of an arbitration proceeding, precludes the application of a duly adopted amendment of a rule relating to a matter of procedure so long as

the parties' substantial rights are not affected. Substantial rights are not affected by a change in a rule governing the form and extent of the decision on an award. The conclusion of the trial court that the amended rule 508 governed the form and extent of the arbitrators' decision is in harmony with the general doctrine that the extent of an order is a matter of procedure, and that procedural rules amended during the pendency of a proceeding apply as amended. (*Sour* v. *Superior Court,* 1 Cal.2d 542 [36 P.2d 373].) ▮ That the parties agreed to be bound by the published rules of the association does not alter the result in the absence, as here, of an express incorporation into the contract of specified rules. The general reference in the contract to published rules of the association did not constitute such an incorporation.

The buyer's principal contention before the board of appeal and at the hearing in the superior court was that since it was afforded no opportunity in the arbitration proceeding to answer the evidence and issues which it claimed were included for the first time in the seller's reply statement, to that extent it had been denied a full and fair hearing before the board of arbitrators, as a result of which the board refused to hear evidence and the award was a nullity.

▮ The merits of the controversy between the parties are not subject to judicial review. By section 1288 of the Code of Civil Procedure the superior court has power to vacate an award "(a) Where the award was procured by corruption, fraud or undue means. (b) Where there was corruption in the arbitrators, or either of them. (c) Where the arbitrators were guilty of misconduct, in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence, pertinent and material to the controversy; or of any other misbehaviors, by which the rights of any party have been prejudiced. (d) Where the arbitrators exceeded their powers, or so imperfectly executed them, that a mutual, final and definite award, upon the subject matter submitted, was not made."

It is not contended that there was any fraud or corruption in the procurement of the award or on the part of any of the arbitrators. But it is claimed that the conduct of the arbitrators in rendering an award upon the statements and replies filed by the buyer and seller without first affording the buyer an opportunity to answer the seller's reply, consti-

tuted ground for vacating the award pursuant to subdivisions (c) or (d) of said section 1288.

Although the merits of the award are not before us it becomes necessary to note the substance of the respective opening statements and replies as filed with the board of arbitrators in order to resolve the buyer's contentions in this regard.

In the buyer's opening statement it was disclosed that the ultimate destination of the copra was scheduled as Mexico; also that the Edna was delayed on the previous voyage and to the buyer's knowledge the vessel was not in a position to load the cargo under the second contract during January or February, 1942. "Knowing of this delay and being desirous of assisting" the seller in making the shipment, the buyer extended or offered to extend its letter of credit from time to time. On January 15, 1942, about five weeks after the signal for this country's entry into the war was touched off by the bombing of Pearl Harbor by the Japanese, and more than one month before the cargo on the previous voyage of the Edna had been discharged, the buyer sent a letter to the seller concerning information received earlier from the seller by telephone that the next trip of the Edna might be cancelled "because of the fact that the British were going to freeze Fiji Island copra for British Empire use." In that letter the buyer offered to sell the copra for domestic consumption if an export permit should be refused for copra to the United States for transshipment to Mexico. No reply was received to that letter. On March 18th the buyer by telephone communicated to seller its knowledge that the Edna was delayed due to repairs and again offered to extend its letter of credit. In that conversation the seller's representative repeated information said to have been previously communicated by telephone that shipment had been cancelled due to inability of seller to obtain an export permit from the government authorities. On March 19th the buyer wrote to the seller advising that the letter of credit had been extended and demanding a "formal statement from you as to just what you are going to do on this shipment on the EDNA," and stating that "if you advise that you are not going to make this trip of the EDNA we will, of course, be forced to take proper steps to protect our interests"; also offering to assist in eliminating difficulties. In a letter to the seller dated March 28th the buyer pointed out that it had never received a letter

which seller assured (in telephonic communication) was being written "explaining that force majeure conditions existed." A letter of April 1, 1942, from the seller informed the buyer that representatives at Suva advised that "all of the copra from this area is being requisitioned by the Fiji Island Government, and that Government regulations absolutely prevent" the seller from either buying or exporting copra on its own account; that therefore, with regret, circumstances prevented fulfillment of the contract. Buyer's reply by letter of April 2nd indicated its lack of faith in the reasons given, alleged the inadequacy of proof, called attention to rule 515 requiring seller to submit proof when nonperformance is claimed to be due to contingency beyond control, and demanded arbitration. The buyer sought damages in the sum of $57,800, the difference in the contract price and the alleged market price of $110 per ton in the United States in March, 1942.

The seller's opening statement comprises three pages in the transcript. It contains the general statement of the reasons for nonperformance, namely, that performance was impossible because the S. S. Edna was delayed by causes beyond the seller's control, i. e. repairs and war conditions, and because the government of the Fiji Islands refused at any time to grant the necessary export permit and in addition purchased all copra in the Fiji Islands. The statement outlined briefly the seller's efforts to obtain a permit, the vessel's delays known to buyer due to repairs and the necessity of proceeding on various phases of its voyage in convoy due to war conditions, the impossibility of loading the contracted copra no matter when the vessel called at Suva, the receipt on January 8th of telegraphic notice from Suva representatives advising that the next trip to Mexico was refused and that it "must be Canada"; that buyer's efforts to guarantee "domestic" consumption were of no avail because the government refused permits for any destination other than Canada; that on February 18, 1942, the British Ministry of Food became the buyer of all copra in the Fiji Islands; that it became impossible to export copra even to Canada on behalf of private parties; that the contract was "therefore terminated because of the prevailing government regulations and because of the impossibility of performance."

The reply of the buyer to seller's opening statement alleged the seller's failure to submit evidence of the existence

of any governmental action claimed to excuse performance, offering a claimed "inescapable" conclusion that no governmental action sufficient to constitute such an excuse ever took place. In purported refutation of the seller's statement that the export of copra to the United States was "impossible," the buyer attached proof that on May 23, 1942, 3,606 tons of copra were shipped from the Fiji Islands to San Francisco via the President Tyler (American President Lines) by private shippers in the Fiji Islands, one of whom, an affiliate of the seller, provided 780 tons of the quantity shipped on the vessel, and showing a price of $110 per ton c.i.f. San Francisco. The buyer also submitted proof of another shipment of copra in bulk loading at Rotuma (under jurisdiction of the Fiji Islands) via the Mexican steamer Marmex, on May 1, 1942, at a price of $59 per ton of 2,240 pounds f.o.b. Rotuma. The buyer also called attention to the fact that the contract, specifying "south sea" copra, was not limited to Fiji Island copra, and that no conditions of "force majeure" were indicated to prevent purchase elsewhere in the South Seas.

The seller's reply to the buyer's opening statement covers 17 pages in the transcript. The history of the contracts and government regulations is reiterated. Explanation of omission of documentary evidence prior to filing the reply statement was included, namely, the conditions of war, the lack of facilities to obtain copies of the documents, and the distances and conditions preventing rapid mail service. Copies of the telegraphic and other advices were included indicating the claimed government regulations forbidding private purchase of copra, or shipment anywhere except to Canada for government use, the originals of which were stated to be in the possession of seller's attorneys in San Francisco and were offered for exhibit upon request. With the exception of the extent of about one page, the seller's reply statement was devoted to commenting on the buyer's opening statement, to setting forth in full the facts and evidence relating to the government regulations claimed in seller's opening statement to prevent performance, and to discussion of the amount of damages alleged by the buyer. In addition, the seller included some statements concerning the effect of war conditions upon the delay of the vessel. These statements include the following:

"It must be understood that Buyer filed this suit even

before the vessel had reached the Fiji Islands. It had previously been delayed as a result of war conditions, which were known to Buyer and which alone, considering the fact that the crew refused to sail on account of war conditions and the fact of other delays encountered because of the war, would have been sufficient to terminate the contract under Foreign Commerce Association Rule 557. The contract called for late January or February loading. Due to causes beyond Seller's control, recognized by Buyer, the vessel was unable to load before June. . . . In addition, during April, May and June the S. S. EDNA was under the complete control of the Government by whom it was directed where to load and where to go. . . . [F]urthermore, that in view of the war conditions delaying the vessel, which were recognized by Buyer, that from February on through June, including the time the ship did arrive in the Fiji Islands during June, 1942, it was not possible to ship copra even to Canada for private purposes. Certainly the foregoing 'prevailing Government Regulations,' which the contract was specifically made subject to, were sufficient to prevent performance, and even had no such proviso been contained in the contract the circumstances were sufficient to compel recognition of the principles of 'impossibility of performance' and 'force Majeure'.''

The contention of the buyer is that it has never had an opportunity before the board of arbitrators to discuss the claimed new matter, namely, the *evidence* of government regulations theretofore generally alleged, nor to answer the issue asserted to have been raised for the first time in the reply statement, namely, the vessel's delay due to war conditions. The buyer claims that had that evidence and the issue been presented in the opening statement, it would have had an opportunity to point out the discrepancies in the evidence, and present proof of the movements of the ship in refutation of any alleged delay due to war conditions.

The following observations would seem to be a complete answer to the buyer's contentions:

Pursuant to rule 557 the seller was not responsible for nonshipment directly or indirectly resulting from a contingency beyond its control, such as an act of government or war; and in event of such contingency, the contract was automatically terminated if shipment was not made within two months after the contractual time for shipment.

■ "Force majeure," or the Latin expression *"vis major,"* is not necessarily limited to the equivalent of an act of God. The test is whether under the particular circumstances there was such an insuperable interference occurring without the party's intervention as could not have been prevented by the exercise of prudence, diligence and care. (See *National Carbon Co.* v. *Bankers' Mortgage Co.*, 77 F.2d 614, 617, and cases cited.) The superior court therefore could conclude that the board of arbitrators ascribed nonshipment to war, either directly causing delay in the vessel's movements, or indirectly by intervention of governmental action provoked by the necessities of war. War in either case was the "force majeure" or superior force which, in the arbitrators' unanimous opinion, sustained cancellation of the contract under the same rule which also provided that if, due to such contingency, shipment be not made within two months after the contractual time for shipment, the contract should terminate.

■ The evidence to support the arbitrators' determination that conditions of "force majeure" existed which terminated the contract, was not required to be in any particular form. The rule (505) called for "written statements of fact, together with written arguments thereon." The parties' written statements of fact were therefore evidence. No special proof beyond the parties' written statements of fact was required. Therefore what would constitute proof of a contingency beyond the seller's control was a question for the arbitrators to determine. ■ The form and sufficiency of the evidence, and the credibility and good faith of the parties, in the absence of corruption, fraud or undue means in obtaining an award, are not matters for judicial review.

In its opening statement the seller made specific mention of the impossibility of performance "because the S. S. [Edna] was delayed by causes beyond its [seller's] control, i. e. repairs and war conditions . . ."; that the ship "was still in the United States, having been delayed as a result of necessary repairs and the necessity of proceeding on various phases of its voyage in convoy due to war conditions; . . . [that the] necessary delay . . . was recognized by the Buyer. . . . However, regardless of the fact of the vessel's delay it became impossible . . . to load the contracted copra no matter when the vessel had called at Suva." The statement then continued with the alleged government regulations. In conclusion it stated that "The contract was therefore terminated

because of the prevailing government regulations and because of the impossibility of performance.'' In its reply to the seller's opening statement the buyer chose to answer only those statements referring to claimed government regulations. The buyer had the opportunity then to refute the seller's claim of delay of the vessel due to repairs and war conditions, but it omitted any reply thereto until its contentions in respect thereof were included in the statement on appeal.

There is therefore no merit in the buyer's contention that the seller's opening statement did not contain evidence or present its case in chief on both grounds of prevention of performance. If we assume that the documentary evidence in support of the ground of governmental interference was not submitted until the seller's reply statement was filed, that fact alone does not call for a conclusion that the award must be set aside. Certainly it does not justify a finding that the arbitrators refused to hear or receive evidence, within the meaning of the rules or the decision in *Christenson* v. *Cudahy Packing Co.,* 198 Cal. 685 [247 P. 207], relied on by the buyer. In that case the award was made without a copy of the seller's opening statement being presented to the buyer and without the latter's reply thereto, obviously a substantial noncompliance with the rules. Other cases relied on by the buyer not involving arbitration, or where there were dissimilar statutory provisions and procedure concerning arbitration, are inapplicable.

The buyer concedes that the use of the phrase ''force majeure'' in the arbitration award could refer to governmental action as a contingency beyond the seller's control. But the burden of its contention is that the employment of that phrase does not indicate whether the arbitrators placed their decision upon the conditions of war causing delay beyond the seller's control, or upon interference by governmental action; that, if the former, the contingency due to war conditions was raised for the first time in the seller's reply statement; or, if the latter, the evidence in support thereof was submitted for the first time in the seller's reply; and that in either event the buyer has had no opportunity to reply thereto and present its case fully. As has been shown, however, the procedure followed does not amount to a refusal to hear evidence. The arbitrators received and considered both the opening and reply statements of both parties in which all of the evidence presented was included. Also, as

hereinabove indicated it may not be said that the opening statement of the seller did not present its prima facie case on both defenses urged as excuse for nonperformance. Statements of fact concerning delay due to war conditions were substantially alike in both the opening and reply statements of the seller. The opening statement of the seller also contained evidence in the form of its statements of fact that governmental action prevented shipment of copra for private account. The documentary evidence of governmental action included in the seller's reply statement was in reality cumulative. Its delayed presentation to the arbitrators amounted merely to a reversal of the general procedure regarding the introduction of documentary evidence. In order that the claimed departure from the usual procedure be held to amount to misconduct of the arbitrators sufficient to vacate the award it must be shown that such departure had prejudiced the rights of the buyer. (Code Civ. Proc., § 1288(c).)

As early as *Manson* v. *Wilcox*, 140 Cal. 206, 208-9 [73 P. 1004], in affirming an order denying a motion to vacate an arbitration award it was said that the misconduct or error complained of, to whatever class it might belong, must be of such character that the rights of the party complaining were prejudiced thereby. The purpose of the law in recognizing arbitration agreements and in providing statutory means of enforcement is to encourage persons to avoid delays by obtaining adjustment of their differences by an agency of their own choosing. This was pointed out in *Utah Construction Co.* v. *Western Pacific Ry. Co.*, 174 Cal. 156, 159 [162 P. 631], where it was also said: "The statutory provisions for a review thereof are manifestly for the sole purpose of preventing the misuse of the proceeding, where corruption, fraud, misconduct, gross error, or mistake has been carried into the award to the substantial prejudice of a party to the proceeding. . . . Therefore every reasonable intendment will be indulged to give effect to such proceedings." (Citing authorities.) (See, also, *Moore* v. *Griffith*, 51 Cal.App.2d 386, 388 [124 P.2d 900]; *Dugan* v. *Phillips, supra,* 77 Cal.App. 268, 278.)

 The buyer made no request to present additional evidence. Neither before the board of appeal, where it purported to state additional facts and to make a complete answer to the reply statement of the seller, nor in the superior court, did the buyer indicate that it was possessed of further

evidence in refutation of the seller's claims; or that if further evidence was available, what that evidence was, or that its effect would be to falsify the governmental action or other conditions of war which were alleged to constitute excuse for nonperformance. In the absence, as here, of any showing that further evidence in the possession of the buyer would disprove the seller's defense, there is no basis for an adjudication of prejudice. The fact that the buyer was not given a further opportunity to comment on and point out any claimed discrepancies and inconsistencies in the cumulative evidence included in the seller's reply statement, is not alone sufficient upon which to base a claim of prejudice. It must be assumed that the arbitrators were experienced men, capable of weighing the evidence and giving due consideration to opposing inferences. ▪▪▪ Furthermore, arbitrators are not bound by strict adherence to legal procedure and to the rules on the admission of evidence expected in judicial trials. (*In re Connor*, 128 Cal. 279 [60 P. 862].) Such a requirement would tend to defeat the object of the arbitration proceeding. (*Everett* v. *Brown*, 120 Misc. 349 [198 N.Y.S. 462, 465].)

The record shows that the arbitrators investigated and examined the original documents relied on by the parties. It also shows that the board of appeal examined and considered all of the evidence submitted to the arbitrators and the statement on appeal in coming to its unanimous decision upholding the arbitration award. The seller contends that the board of appeal had no power to hear evidence anew, or new or additional evidence, but was necessarily confined to the evidence produced before the arbitration committee. The board of appeal unquestionably had the power to examine and consider, as it did in this case, the entire evidence and any proffered additional evidence for the purpose of determining whether any claimed misbehaviors or misconduct of the arbitrators prejudiced the rights of the complaining party. The record also shows affirmatively that the arbitrators reached a mutual, definite and final award without hindrance in any respect.

We conclude that there was no denial to the buyer of its right to present its case; that there was no refusal to hear evidence; that there was a substantial compliance with the rules and that any departure from the usual order of receiving the documentary evidence was not shown to have prejudiced the rights of the complaining party; and that there was

no excess or imperfection in the execution of their powers by the arbitrators by which a mutual, final and definite award was prevented. There is therefore support for the conclusion of the trial court that the award should not be vacated.

The order is affirmed.

Gibson, C. J., Edmonds, J., Carter, J., Traynor, J., Schauer, J., and Spence, J., concurred.