322 F.2d 173
 RAYTHEON COMAPNY, a corporation, Appellant and Cross-Appellee,
v.
RHEEM MANUFACTURING COMPANY, a corporation, and Rheem
Semiconductor Corporation, a corporation,
Appellees and Cross-Appellants.
 No. 18257.
 United States Court of Appeals Ninth Circuit.
 Aug. 27, 1963.
 
 Pillsbury, Madison & Sutro, Francis R. Kirkham, Francis N. Marshall, Thomas E. Haven, and Richard W. Odgers, San Francisco, for appellant and cross-appellee.
 Brobeck, Phleger & Harrison, and Moses Lasky, San Francisco, for appellees and cross-appellants.
 Before HAMLEY, JERTBERG and DUNIWAY, Circuit Judges.
 HAMLEY, Circuit Judge.
 
 
 1
 This action for injunctive and declaratory relief was brought by Raytheon Company (Raytheon) against Rheem Manufacturing Company. (Manufacturing and Rheem Semiconductor Corporation (Semiconductor). The case involves the construction of a contract, and of a lease executed pursuant thereto, under which Raytheon went into possession of Semiconductor's manufacturing plant at Mountain View, California. District court jurisdiction rests on diversity of citizenship. From a judgment partially in favor of defendants and partially in favor of Raytheon, the latter appeals and defendants cross appeal.
 
 
 2
 Manufacturing, a California corporation, is a diversified manufacturing company. It holds a 99.9 per cent interest in Semiconductor. The latter is a California corporation which, prior to entering into the contract with Raytheon, was engaged in the manufacture of electronic semiconductor devides at its plant in Mountain View. Raytheon is a Delaware corporation which manufactures electronic devices in two eastern cities.
 
 
 3
 In 1960, negotiations between Manufacturing and Raytheon were carried on for the purpose of exploring various possible business relationships into which the two companies might wish to enter. In 1961 these discussions centered around the proposal for Raytheon to acquire some or all of the assets of Semiconductor, which was not prospering. As a result Raytheon and Semiconductor entered into the basic contract of November 1, 1961, and the lease of November 30, 1961, which lie at the heart of this suit.
 
 
 4
 Under the basic contract Semiconductor assigned to Raytheon its interest as lessee of certain property on which the Mountain View plant is located. It also sold to Raytheon, for $1,100,000, the existing inventory and, for $923,800, the leasehold improvements and a designated part of the manufacturing equipment referred to in the contract as the 'A' list. Under this contract Semiconductor also agreed to lease most of the remaining equipment, described in the contract as the 'B' list, to Raytheon. The form of the proposed lease was incorporated verbatim in the basic contract as Exhibit B thereto.
 
 
 5
 Section 2(b) of Article I of the basic contract gave Raytheon the right, exercisable until December 15, 1961, to return any of the 'A' list items and substitute 'B' list items of an equal or greater book value subject to payment of ninety per cent of book value for any increase. The period during which this right could be exercised was later extended into January, 1962.
 
 
 6
 The lease of the 'B' list items contains the language in controversy. Under that lease, Semiconductor leased the items to Raytheon for six months from December 1, 1961 to June 1, 1962, for the sum of $250,000, payable in equal monthly installments. At the expiration or termination of the lease, Raytheon was required to deliver all of the leased property which it should not theretofore have purchased, to Semiconductor at the loading docks of the Mountain View plant, packed for shipment if Semiconductor should so request. Section 12 of the lease, quoted in the margin, provided the method whereby Raytheon could purchase items contained in the 'B' list.[1]
 
 
 7
 The basic contract was chiefly negotiated, on behalf of defendants, by a vice president and director of Manufacturing who was also treasurer of Semiconductor, and by the treasurer of Manufacturing. While the formal parties ot the basic contract November 1, 1961, following the execution the approval of Manufacturing was appended thereto.[2]
 
 
 8
 Raytheon took over the operation on November 1, 1961, following the exdecution of the basic contract. It thereafter exercised its right to make substitutions from the 'B' list, and acquired about thirty per cent of those items by such exchanges.
 
 
 9
 On January 12, 1962, Manufacturing advised Raytheon that it intended to make an offer to its subsidiary, Semiconductor, for some of the leased 'B' list items. Raytheon at that time acknowledged that Manufacturing had such a right, and in fact Raytheon was aware of this possibility when the contract was negotiated. On the same day Manufacturing engaged the services of James Ellison, an expert in the appraisal of used machinery, wich instructions to determine the value of the leased equipment.
 
 
 10
 On January 16, 1962, Ellison furnished Manufacturing with a written estimate of value in hwich he divided the items into two groups. On the first of these groups Ellison placed a valuation of $547,760. On the other, consisting of the remaining items which he regarded as less saleable, Ellison placed a valuation of $91,200. The total valuation according to this January 16th estimate was accordingly $638,960.
 
 
 11
 On January 17, 1962, Manufacturing delivered to Semiconductor a written offer to buy the leased items excluding the $91,200 group, for $547,760, delivery to be made to it on the loading dock at Mountain View on June 1, 1962. This offer which was made subject to Reytheon's right of first refusal under section 12 of the lease, was accompanied by a check in the amount of ten per cent of the purchase price as a deposit. On the day that Manufacturing made this offer it was accepted by Semiconductor. On the next day Semiconductor wrote to Raytheon, notifying it of the offer and acceptance subject to Raytheon's right of first refusal, and requested prompt advice as to Raytheon's election.
 
 
 12
 On January 22, Raytheon requested an extension of time to January 29th, in which to 'decide what to do,' and this request was granted. On the following day, however, Raytheon wrote to Semiconductor, acknowledging receipt of the notice of January 18th and advising that the notice was of no effect. Two reasons were given for this view, the first being that any offer by Manufacturing 'cannot be treated as a 'bona fide' offer.' The second reason was that the offer failed to specify the individual prices offered for each item of equipment.
 
 
 13
 Before receiving Raytheon's letter, Semiconductor discovered that Ellison had included in his $547,760 figure some items of equipment which were not located at the Mountain View plant. Semiconductor immediately asked Manufacturing to change its offer to eliminate the non-deliverable items. This required a reappraisal with the unavailable items omitted. On the basis of this reappraisal, made by Ellison, and after Manufacturing and Semiconductor and rescinded the previous offer and acceptance, Manufacturing, on January 26, made a new offer of $531,584. Later the same day Semiconductor accepted this offer, subject to Raytheon's right of first refusal.
 
 
 14
 On the same day, Semiconductor wrote to Raytheon notifiying if of the new action. On January 29, 1962, A. Lightfoot Walker, who was president of both Manufacturing and its subsidiary, Semiconductor, wrote to Raytheon. Walker therein acknowledged that the latter had until the close of business on February 2, 1962, to exercise its right of first refusal as to the new offer.[3]
 
 
 15
 On February 2, 1962, Raytheon responded by a letter, qooted in the margin, which Raytheon contends, but Manufacturing and Semiconductor deny, constituted a valid exercise of its right of first refusal.[4] On February 6, 1962, Semiconductor wrote to Raytheon advising that the latter's letter of February 2, 1962 was not an exercise of its right of first refusal as against Manufacturing's offer, and that the latter, and its acceptance by Semiconductor, had resulted in a firm contract.
 
 
 16
 Raytheon then brought this action, alleging that the offer of Manufacturing was not bona fide. Instead, Raytheon alleged, it was merely an effort by the parent and subsidiary to set prices for the assets in question in such a manner as to frusrate the method of price determination provided for in the contract. Raytheon asked for a temporary restraining order and injunction against the sale from Semiconductor to Manufacturing and for a judgment declaring the rights of the parties. A declaration of rights with respect to two questions was sought, (1) Was Manufacturing's offer to Semiconductor a bona fide offer within the meaning of the lease?; (2) If Manufacturing's offer was bona fide, did Raytheon sufficiently exercise its right of first refusal?
 
 
 17
 As a counterclaim, defendants alleged that Ratheon's purpose was to acquire the leased assets at distress values, and that consequently a third controversy required resolution by the court, viz.: Is the fair market value of the assets in connection with Raytheon's purchase of the remaining 'B' list items the value of such assets in their present location and as a part of Raytheon's operations (as contended by Semiconductor), or, as defendants interpret Raytheon's position, 'the value of the assets as removed from the premises and sold at distress or forced sale'?
 
 
 18
 After a trial on the merits the court held and judicially delcared: (1) the offer of Manufacturing to Semiconductor was bona fide; (2) Raytheon sufficiently exercised its right of first refusal, so as to give rise to a binding contract between Raytheon and Seminconductor the the purchase and sale of the items covered by Manufacturing's offer, for $531,584; and (3) in the appraisal of the 'B' list items not included in Manufacturing's offer to Semiconductor, to be conducted by a representative of the American Appraisal Company pursuant to section 12 of the lease, the value to be appraised is 'the fair market value of the assets to Raytheon in the present location of such assets at the Mountain View plant as part of the operations of Raytheon.'[5]
 
 
 19
 Raytheon has appealed from all parts of the judgment except that which decrees that it exercised its right to purchase the assets embraced in the offer. Manufacturing and Semiconductor have appealed from the part of the judgment which holds that Raytheon sufficiently exercised its right of first refusal so as to bring into existence a binding contract between Raytheon and Semincoductor for the purchase and sale of the items covered by Manufacturing's offer.
 
 
 20
 The question first presented is whether the district court erred in holding that the offer Manufacturing made to Semiconductor for the purchase of 'B' list items was a bona fide offer within the meaning of the lease.
 
 
 21
 Plaintiff argues that 'bona fide' means in 'good faith' and that 'good faith' turns on the actuating motive with which an offer is made. If the offer is made for some ulterior or collusive purpose which would be foreign to an ordinary arms-length transaction between purchaser and seller, plaintiff in effect argues, the offer is not bona fide. Plaintiff argues that Manufacturing did have an ulterior and collusive purpose in making this offer. This purposes, plaintiff asserts, was to put Raytheon in a position where it would either have to buy the list selected by Manufacturing at the price determined by Manufacturing (rather than select the items it wanted and pay a price determined under the formula set out in section 12 of the lease) or lose the equipment and the credit value, against purchase price, of $250,000 rent.
 
 
 22
 Defendants, on the other hand, argue that 'good faith' turns on the actuating motive only where the term modifies 'purpose' or 'motive.' Here, defendants point out, the words 'bona fide' modify 'offer.' They therefore argue that all that the words 'bona fide' mean in the context of the lease in issue, is that the offer must be a real offer, not a sham. Manufacturing did make an offer, it was accepted by Semiconductor, money passed, and a contract of purchase and sale between the two resulted. Thus, according to defendants, the offer was 'bona fide' whatever purpose Manufacturing may have had in making it. Defendants further argue, however, that if Manufacturing's purpose and motive in making the offer is relevant, they were in fact legitimate under the established facts of this case and the offer was therefore 'bona fide' even under plaintiff's interpretation of the term.
 
 
 23
 We agree with defendants and the trial court that, by the addition of the words 'bona fide,' the parties did not intend to exclude Manufacturing from making an offer.[6] But if Manufacturing, despite its 99.9 per cent ownership of Semiconductor, was to have the status of an independent third person in this regard, the parties must have intended that Manufacturing would adhere to that role insofar as the motivation behind any such offer is concerned. For it is clear that if Manufacturing was not confined to such a role in making an offer, but could make an offer for the purpose, and having the effect, of depriving Raytheon of its purchase rights, the latter rights as spelled out at length in the lease would be illusory.
 
 
 24
 Considered in this light, the words 'bona fide' added to the contract at Raytheon's request, after its counsel learned that Manufacturing desired standing as a possible offeror, have special significance. Their effect, we hold, is to preclude an offer by Manufacturing made only to aid Semiconductor in obtaining more favorable results from its contract with Raytheon than could have been possible without the offer.
 
 
 25
 In our view, the record overwhelmingly establishes that Manufacturing's offer here in issue had this improper motivation and, if allowed to trigger the first-refusal provision of the contract, will effectively deprive Raytheon of its purchase rights under section 12 of the lease.
 
 
 26
 Perhaps the most striking evidence of this has to do with the formulation of the price which was stated in Manufacturing's offer. As stated earlier in this opinion, Manufacturing advised Raytheon on Friday, January 12, 1962, that it intended to make an offer to Semiconductor for some of the 'B' list items. On the same day Manufacturing engaged Ellison to determine the value of the leased equipment.
 
 
 27
 On the next day, Saturday, January 13, 1962, Ellison spent about four hours at the Raytheon plant where the equipment was located. Later that day he gave E. L. Oesterle, an accountant of Manufacturing, his preliminary estimate of such value. On Sunday, January 14, 1962, Ellison flew east on other business and, en route, computed value on an item by item basis, coming out with a figure very close to the preliminary figure he had given Oesterle. Before leaving for the East Ellison had dictated a letter to Manufacturing, to be dated January 15, 1962, setting out his valuation figures. Ellison confirmed these figures by telephone from Washington after he had completed his computation en route, and the letter was sent out as dictated.
 
 
 28
 In this letter, after stating the net book value of the equipment to be $1,124,687.76, Ellison expressed this opinion as to value:
 
 
 29
 'It is my opinion that the net return to your company if this equipment were to be sold by you for cash based upon the equipment being removed from the plant, placed on your loading dock in a suitable condition to be picked up and transshipped to another location but otherwise on an as is basis, would be somewhere between a low of $400,000 and a high of $500,000.'
 
 
 30
 Testifying at the trial Ellison explained the reason for the spread between $400,000 and $500,000 in his estimate. A liquidator, he stated, would have paid $400,000 for the equipment on the loading dock. But one who could use from thirty to forty per cent of the equipment, and would then liquidate the rest might pay $500,000. Ellison first testified that this appraisal was not intended to represent fair market value of the assets delivered to the loading dock. It was, he said, '* * * liquid value, lump sum, or lot sale value,' for which, in his opinion, the whole group of assets could have been sold to one person, such as a speculator or liquidator, for resale.
 
 
 31
 Later, Ellison testified in effect that his January 15 range of figures represented fair market value of the equipment on the loading dock.[7] Still later, Ellison testified that what he was asked to determine, prior to his first appraisal, was 'fair wholesale value.' By this he meant what he, as a liquidator, or 'machinery people,' might be asked to submit as a bid for the whole lot on the loading dock on June 1, 1962.
 
 
 32
 Upon receiving Ellison's January 15 estimate of value, Manufacturing requested him to immediately furnish a figure which would represent 'a very fair price for the equipment in place to Raytheon.' Ellison was requested to be conservative in arriving at this figure. He was given to understand by Manufacturing that his new figure was to be the basis of an offer to Raytheon.
 
 
 33
 Following these instructions Ellison, on January 16, 1962, which was one day after his original appraisal, furnished a written statement containing his new estimate of the value of the 'B' list items. In this statement, Ellison divided the items into two groups, one less marketable than the other. For both groups together, which comprised the same assets which Ellison had valued at from $400,000 to $500,000 on the previous day, he now placed a valuation of $638,960. Broken down between the two groups, Ellison placed a value of $547,760 on the first group and $91,200 on the group of less marketable items.[8] Ellison testified that this appraisal 'was substantially influenced on the downward side' by Manufacturing's caution to be conservative.
 
 
 34
 As before stated, the $547,760 figure, and the items which it covered, provided the basis for the first offer by Manufacturing to Semiconductor, which was immediately accepted. Also, as indicated above, this offer was later withdrawn because it was found to contain some unavailable items and a new offer, in the amount of $531,584, taking into account Ellison's estimate of the omitted items, was made by Manufacturing and immediately accepted by Semiconductor.[9]
 
 
 35
 Ellison's January 15th appraisal of these same items, to adopt a calculation in Raytheon's brief which seems to be fair, was a minimum of $298,674 (value on the loading dock to a liquidator) and a maximum of $396,142 (value on the loading dock to a purchaser who would use thirty to forty per cent of the equipment and liquidate the rest). Manufacturing's offer to Semiconductor was thus about thirty-four per cent higher than the maximum figure Ellison had estimated this equipment would be worth on the loading dock where, under the offer, Manufacturing would take delivery.
 
 
 36
 Ellison testified that a 'disruption value' to Raytheon on the equipment covered by the offer would be $1,750,000, and indicated that he so advised Manufacturing at the time his appraisals were being formulated. By 'disruption value' was meant the value to Raytheon in not having those assets taken away, thereby requiring Raytheon to go out and replace the equipment. Ellison characterized his $1,750,000 'disruption value' as 'up in the atmosphere' and probably twenty-five per cent more than Manufacturing's acquisition cost.
 
 
 37
 The recited circumstances, established by undisputed testimony, show that Manufacturing consciously failed to base its offer on the objective market price of the equipment of Mountain View, where it proposed to take delivery, as determined by its own appraiser. Instead, and after discarding that appraisal, it offered a thirty-four per cent higher price, based upon an appraisal thereafter made at its request. This appraisal was designed to represent value 'to Raytheon' at the plant, where Manufacturing could not take delivery, the appraiser being told that it was to serve as the basis of an offer to Raytheon.
 
 
 38
 The only possible explanation is that the offer was intended as a means of coercing Raytheon into giving up its purchase rights under the price formula of section 12 of the lease.
 
 
 39
 There is also more in the record which points to the same conclusion and nothing that we can find suggests a different motivation.
 
 
 40
 Manufacturing was concededly going out of he semiconductor business. While there was the possibility that Manufacturing could use some of these items, it had no use for a complete line of items which would be an operating production line for the manufacture of semiconductors.
 
 
 41
 While Manufacturing had previously carried on some negotiations and entertained some inquiries from others concerning the purchase of the equipment,[10] no offers had been received and no negotiations were being pursued at the time the offer was made. Moreover, as we have indicated, the offer was so far above appraised value of the items delivered to the loading dock that there could have been only the remotest possibility of resale to others at the price specified in the offer, much less such higher price as would have been necessary to afford Manufacturing a profit.
 
 
 42
 Two officers of Manufacturing admitted, during their testimony in this trial, that Manufacturing's prime purpose in making the offer was not to acquire the equipment for itself, but to put Raytheon in a position where it would have to buy the equipment by exercising its right of first refusal. This testimony came from Gordon Mallatratt, who was vice president and director of Manufacturing and treasurer of Semiconductor, and from A. Lightfoot Walker, who was president of both Manufacturing and Semiconductor.[11]
 
 
 43
 Actually it is only necessary to read defendants' brief on this appeal to learn that, in making the offer, Manufacturing acted in concert with Semiconductor for the sole purpose of bailing out Semiconductor on what was regarded as a disadvantageous contract. After recounting the serious problem which confronted Semiconductor by reason of the facts that, in exercise of its contract rights, Raytheon had acquired thirty per cent of the 'B' list items under its acknowledged right of substitution, and that Raytheon had sounded out an unauthorized accountant of Manufacturing on the possibility of acquiring all of the 'B' list items for from $350,000 to $385,000, defendants, at page 13 of their brief, state:
 
 
 44
 'Manufacturing therefore decided to make an offer to Semiconductor for some of the B list. * * * This has been described as a 'stop loss approach' to the situation (R.Tr. 211).'
 
 
 45
 Throughout this entire litigation it has been defendants' position that the corporate veil must not be pierced, but that Manufacturing and Semiconductor must be regarded as separate corporate entities. We fully accept that principle insofar as it establishes that Manufacturing, like any other person, was entitled to make an offer to Semiconductor which would set into motion the first refusal provision. But the truth is, as amply demonstrated by what has been said above, that Manufacturing and Semiconductor have not in fact acted as separate corporations in this matter, but as one corporation doing what Semiconductor could not do alone to defeat Raytheon's rights. The corporate veil here precludes any presumption of improper relationship based on stock ownership and joint management. But it can neither obscure nor shield a transparent attempt, in fact, by parent and subsidiary to join forces in an attempt to deprive Raytheon of the rights it bought when it entered into the contract.[12]
 
 
 46
 We are not certain that the trial court's holding that this was a bona fide offer represents, to any extent, a finding of fact as distinguished from a conclusion of law. Few if any of the facts recited above, relative to the entering into of the contract, the making of the appraisal, and the resulting offer and acceptance, are in dispute. The trial court's determination may well have been predicated primarily upon the limited construction which defendants place upon the words 'bona fide,' which construction we hold to be incorrect for reasons already stated.[13] But if, in any respect, this holding by the trial court represents a finding of fact, such finding in our opinion is clearly erroneous.
 
 
 47
 Having determined that the offer made by Manufacturing was not bona fide within the meaning of the lease, it is unnecessary to decide whether, as questioned on the cross appeal, Raytheon validly exercised its right of first refusal.
 
 
 48
 The remaining question is whether the trial court erred in holding that, in the appraisal of the 'B' list items not covered by the offer, to be conducted by representatives of the American Appraisal Company in the event Raytheon seeks to buy them, the value to be appraised is 'the fair market value of the assets to Raytheon' in the present location of such assets at the Mountain View plant as part of the operation of Raytheon. Since we have held that Manufacturing's offer was not bona fide, this ruling by the trial court would, if permitted to stand, apply to all 'B' list items Raytheon desires to buy.
 
 
 49
 Both plaintiff and defendants believe that this was an appropriate issue to submit to the district court and that we should deal with it on the merits.
 
 
 50
 We disagree. Under the terms of the contract the parties left it to a representative of the American Appraisal Company to determine 'a fair market value of the property.' We do not now know whether such representative will adopt the view urged by defendants and accepted by the trial court, or that urged by plaintiff, or some other measure of value. We are not sure that we should assume that the representative of the American Appraisal Company will not make an appraisal acceptable to all concerned. But if he does not, there is the further question whether it would not be the duty of such representative to settle the issue by himself, placing a construction, binding upon the parties, upon the words of section 12 'a fair market value of the property.'
 
 
 51
 My Brothers on the panel are of the view that the answer to that question is plain and that it should be stated now. Their answer, which is the ruling of the court, and their reasons for reaching this conclusion, are as now stated.
 
 
 52
 What the parties bargained for, among other things, was a determination of the meaning of the words 'a fair market value of the property' by an authorized employee or agent of the American Appraisal Company. His determination thereof, absent fraud, was intended to be conclusive and binding upon the parties. It is therefore improper for the court, either before or after the representative of the American Appraisal Company has done so, to add a gloss to the parties' own language.
 
 
 53
 As stated by the California Supreme Court in Silva v. Mercier, 1949, 33 Cal.2d 704, 708, 204 P.2d 609, 612:
 
 
 54
 'When an agreement provides for the determination by a third person or persons of some proper matter to be settled and that the decision shall be final, a submission to and determination by him or them of the matter is binding on the parties. That is true whether the arrangement is technically a common law or statutory arbitration or something akin thereto.'
 
 
 55
 It is settled, both under the Federal Arbitration Act (9 U.S.C. 1-14) AND UNDER THE CALIFORNIA ARBITRATION act (code of Civil proceDure 1280-1293), that where an arbitrator makes an award, the award cannot be upset on the ground that a court is of the opinion that the arbitrator misinterpreted the law. This court has expressly held that an award under the federal act will not be set aside for mere error in the law or failure of the arbitrator to understand or apply the law. San Martine Compania De Navegacion, S.A. v. Saguenay Terminals, Ltd., 9 Cir., 1961, 293 F.2d 796.
 
 
 56
 The California courts, under the California Act, arrive at the same conclusion. In B.S.B. Constr. Co. v. Rex Constr. Co., 4th Dist., 1962, 200 Cal.App.2d 327, 19 Cal.Rptr. 167, the dispute submitted to arbitration presented questions of interpretation as to the meaning of the contract, as would arbitration in our case. It was held that the award could not be attacked, since the objections to it went to the merits of the dispute rather than to the jurisdiction of the arbitrators. 'It now is settled that 'in the absence of some limiting clause in the arbitration agreement, the merits of the award, either on questions of fact or of law, may not be reviewed except as provided in the statute' (Crofoot v. Blair Holdings Corp., 119 Cal.App.2d 156, 186, 260 P.2d 156, 172; Sapp v. Barenfeld, 34 Cal.2d 515, 523, 212 P.2d 233; Pacific Vegetable Oil Corp. v. C.S.T., Ltd., 29 Cal.2d 228, 235, 238, 174 P.2d 441; Flores v. Barman, 130 Cal.App.2d 282, 286, 279 P.2d 81; In re Frick, 130 Cal.App. 290, 292, 19 P.2d 836).'
 
 
 57
 In the opinion of the writer, it may be that the parties are bound to accept the American Appraisal Company representative's construction of what is meant by the words 'a fair market value of the property,' as used in the contract, although it is not altogether clear that the provision for an appraisal by such a representative is an arbitration agreement.
 
 
 58
 But since, for the reasons indicated above, the question may never arise, the writer does not believe the court should decide it now. Moreover, the question as to the conclusiveness of the representative's interpretation of the contract in this regard not having been raised or argued either in the district court or here, reversal on our sua sponte consideration thereof seems to do violence to our rule against reversing on a ground not raised or argued.
 
 
 59
 The panel is unanimously of the view, but for the varying reasons noted above, that the holding of the trial court on this issue should be set aside, without prejudice.
 
 
 60
 The judgment is reversed and the cause is remanded to the district court for entry of a judgment consistent with this opinion.
 
 
 
 [1]
 '12. Right of First Refusal: In the event that, during the first ninety (90) days after the commencement of the term of this Lease, Lessor shall have received a bona fide offer for any item or items of the Leased Property, Lessee shall have the right within five (5) business days from the date on which notice of such offer (specifying the price or prices offered) is communicated to Lessee at its Mountain View plant facility to purchase from Lessor such item or items of the Leased Property at the price or prices, as the case may be, specified in such offer. In the event Lessee exercises such right, the item or items of Leased Property shall be conveyed to Lessee by Lessor. In the event that Lessee does not exercise such right within such five (5) business days or indicates its desire not to so exercise, Lessor shall have the right to sell, subject to the remaining term of this Lease, such item or items to the party making such offer at the price or prices, as the case may be, offered by such party as set forth in said notice
 'After the expiration of said ninety (90) days, Lessor shall have the right, subject to the remaining term of this Lease, to sell all or any part of the Leased Property to any party or parties at any time or times and at such price or prices as it shall deem advisable and shall notify Lessee of any such sale.
 'On or prior to May 15, 1962, Lessee may elect by written notice specifying the item or items to purchase any one or more items of the Leased Property not previously sold or for which Lessor has not accepted a previous offer at a purchase price for each such item of property determined as follows:
 '(a) In the event of mutual agreement between the parties, the price mutually agreed;
 '(b) In the event of failure of mutual agreement, the price equal to the lower 90% Of the book value of such item of property as shown on Lessor's books of account as of June 30, 1961, determined from the original cost of such property as shown on Schedule 1 attached and depreciated to said June 30, 1961, or the value of such item of property as determined by appraisal for the purposes of determining a fair market value of the property by an authorized employee or agent of the American Appraisal Company.
 'All rents paid or to be paid hereunder shall be credited against and applied to ward the purchase price of such items purchased by Lessee.
 'Raytheon further agrees to make a separate written offer on May 15, 1962 to buy all then remaining Leased Property at whatever price Raytheon shall in its sole discretion elect and without obligation under the appraisal procedure outlined above, or to purchase the property if such offer is not accepted. Rheem may, but shall not be obliged to accept such offer. Rheem may accept such offer by written acceptance to Raytheon on or before May 25, 1962.
 'Payment of so much of the purchase price for items purchased (whether purchased pursuant to the right of first refusal set forth above or the rights to purchase contained in the preceding paragraph) as exceeds rental then paid shall be made in cash or by certified check within fifteen (15) days following agreement upon or determination of the purchase price and any payment of any such excess shall be deemed to be advance payment pro tanto of rents thereafter fully due.'
 
 
 [2]
 This approval took the following form:
 'The undersigned, Rheem Manufacturing Company, hereby approves the principal terms of the transactions described in the foregoing Agreement and the nature and amount of the consideration to be received by Rheem Semiconductor Corporation and hereby agrees to take whatever action shall be necessary or appropriate for the undersigned to take in order that the Closing thereunder shall be completed and in order that Rheem Semiconductor Corporation shall comply with the provisions of this Agreement.'
 
 
 [3]
 Walker's letter closed with this paragraph:
 'We must further advise you that any action on your part, whether in making any offer to buy assets under the Lease Agreement or otherwise, which would, if given effect, prevent the consummation of the sale to Rheem Manufacturing Company of the assets covered by its offer by assertion of your right to take title thereto at or before June 1, 1962 or otherwise, will be regarded by us as a denial of your obligation to make delivery of such assets upon expiration of the Lease and as a breach thereof. I am sure you understand that such a breach under Section 10 of the Lease, unless remedied within thirty days after notice thereof, will, among other rights, permit us to terminate the Lease, retain the rents theretofore paid and retake possession of all the leased assets.'
 
 
 [4]
 'Raytheon Company hereby notifies you that it unconditionally makes the election and exercises its rights pursuant to said Paragraph 12 to purchase the items of equipment listed on Exhibit 'A' attached hereto
 'It is necessary that the price of the items hereby purchased be determined. As you know, it is our position that no bona fide offer has been received by you for any of the items listed and that the price will be determined pursuant to other provisions of the agreement.'
 
 
 [5]
 The temporary restraining order was granted ex parte prior to the hearing. At the hearing on the application for injunction defendants pointed out that Raytheon's possession of the property under lease could not be disturbed until June 1, 1962, and asked for an immediate trial. The case was set down for trial in May, 1962. No interlocutory injunction ever issued
 
 
 [6]
 While Raytheon originally took the position that Manufacturing could not under any circumstances made an offer, and relied upon it at the trial as one ground for relief, it does not now insist upon that view. In fact, Raytheon now concedes that an offer could not be regarded as not 'bona fide' for the sole reason that it was made by Manufacturing. In its brief on appeal Raytheon states: '* * * this is not to say that, under appropriate circumstances a bona fide offer could not have come from Rheem (Manufacturing).'
 
 
 [7]
 'MR. WHEAT (for Raytheon): I interpret fair market value on the loading dock to be the amount which a willing but uncoerced buyer would, in your opinion, pay for these items, if they were on the loading dock ready for delivery to him, purchased from a willing but uncoerced seller. * * *
 'A. If I understand you, this means anybody who wasn't coerced might have, in my opinion, paid four to five hundred thousand dollars for this equipment on the loading dock. My answer is yes, this would be readily salable in that bracket to someone who wasn't coerced as a buyer from Rheem not otherwise qualified, whether he was a user or someone who might resell it. * * *'
 
 
 [8]
 In his written statement submitting these figures, Ellison makes clear his understanding that the $547,760 is to be the basis of an offer to Raytheon, not Semiconductor. He wrote:
 'Schedule 'A' will comprise the remainder of all assets on the IBM tab sheets which, accoring to the telephone conversation with Mr. Ellison, Mr. Stroup, and Mr. Lewis on January 16, should be offered to Raytheon at a net figure of $547,760. The total, therefore, of lists 'A' and 'B' to Raytheon would be $638,960.'
 
 
 [9]
 The original cost of the items covered by this new offer was $1,037,759, and its book value as of June 30, 1961, was $848,881. The $531,584 offer was thus about sixty-three per cent of the book value
 
 
 [10]
 Manufacturing had some earlier negotiations with a Japanese concern. It had received an indication of possible interest from the Stanford Research Institute. There had been some preliminary talk about using some of these assets in Greece
 
 
 [11]
 Mallatratt testified:
 'A. Our apprehension was in the area that they might well tkae certain testing equipment and certain other key equipment that would break up the desirability of the remaining assets so that it could not be used for investment abroad or elsewhere as a line and for sale as a line; that we could not maximize the return to our company, and we were interested in the long run in maximizing the return.
 'Q. You were interested, then, in having Raytheon, regardless of what its rights may have been, to buy all of this stuff or none of it; wasn't that part of the problem?
 'A. Yes, that certainly was part of it.'
 Walker testified:
 'Q. Mr. Walker, what was the business purpose motivating Rheem Manufacturing in making these offers we have been discussing to pruchase certain of the assets which had been leased by Rheem Semiconductor to Raytheon Company?
 'A. We wished to generate the maximum value out of the remaining assets.'
 
 
 [12]
 In reaching this conclusion we have not attempted to evaluate the significance of the undertaking by Manufacturing, attached to the basic contract and quoted in note 2, above, that it would do what was necessary or appropriate in order that Semiconductor shall comply with the contract; or of Walker's inexplicable threat to Raytheon quoted in note 3, as to the dire consequences if Raytheon, by making an offer under the lease agreement, should prevent consummation of a sale to Manufacturing of the items covered by the latter's offer. It is sufficient to say that if they have any implications relevant here, they are in favor of the conclusion we have drawn
 
 
 [13]
 The trial court did find that there was no fraud or misrepresentation at any time on the part of Manufacturing or Semiconductor. We do not hold that this finding is clearly erroneous. The conduct of these two companies in formulating, extending and accepting the offer in question may well have resulted from incorrect legal advice concerning their rights and duties under the contract, and be wholly free from an intention to defraud or deceive